383 S.E.2d 801

**STATE of West Virginia**

v.

**Mark Allen PARKER.**

No. 18460.

Supreme Court of Appeals of West Virginia.

July 13, 1989.

---

Ernest M. Douglass, Parkersburg, for Parker.

C. Terry Owens, Sp. Asst. Atty. Gen., Charleston, for the State.

WORKMAN, Justice:

This case is before the Court upon the appeal of Mark Allen Parker (Parker). It

arises from the April 25, 1985,[1] jury verdict in Wood County, West Virginia, which found the defendant guilty of first degree murder without a recommendation of mercy for the death of eleven-year-old Dale Mowery. The defendant raises three assignments of error based on the proceedings which occurred in the lower court: 1) whether the prompt presentment statute (*W. Va. Code* § 62–1–5 [1965]) was violated when the defendant was not presented before a Magistrate after probable cause was established that he had committed a crime, and therefore, as a result of such failure, whether the lower court should have suppressed subsequent confessions; 2) whether the defendant's Sixth Amendment right to counsel was violated when he was questioned by the sheriff's department after being arraigned and requesting counsel, yet prior to counsel actually being appointed to represent him and prior to the defendant consulting with counsel; and, 3) whether the lower court erred in sustaining[2] an objection to the defendant's proffered testimony of John Riel (Riel) which would have been that a year before Riel had attempted to purchase marijuana from the victim's mother and was told by her that she had no marijuana because Paul Sharp (Sharp) had run out of his supply of marijuana. We find that the lower court committed no error in its rulings pertaining to the above-mentioned issues and therefore affirm the defendant's conviction.

On August 1, 1984, the body of Dale Mowery, an eleven-year-old boy, was discovered in Worthington Creek near Parkersburg, West Virginia. It was determined that the victim died of strangulation. There was also evidence that his hands and feet had been tied together.

The evidence at trial showed the existence of a relationship between the defendant and the victim. The defendant took the victim hunting, fishing, and camping; bought him jewelry and clothing; took him

on picnics; and spent the night with him. Apparently, the defendant also utilized the eleven-year-old in a "quarter scheme", where a roll of quarters would be exchanged by the boy in stores for currency equal in value to a roll of quarters, when, in reality, every other quarter in the roll was a nickel.

On Saturday, July 28, 1984, the defendant appeared at Dale Mowery's house looking for Dale. When the defendant took the stand, he testified that he told Joy Mowery, the victim's mother, that he wanted to talk to Dale because the boy had discussed the "quarter scheme" with some of his young friends, who had in turn told their parents. The parents apparently had gone to the police. The defendant testified that he stated to Joy Mowery that "I told that little son-of-a-bitch not to tell about them quarters," and "I'm not going back to prison for nobody." He also stated that he needed to eliminate Dale as a beneficiary to one of his insurance policies since "little Dale won't be coming around anymore," according to Vickie Stephens who testified for the state.

The testimony offered by two missionaries indicated that on July 30, 1984, two days before Dale Mowery's body was discovered on August 1, 1984, the defendant told the missionaries from the Jesus Christ Church of Latter Day Saints that Dale was dead and that his body had been found. He further told the missionaries that someone had hog-tied and strangled the boy. The defendant stated that he had gone down to the morgue with the victim's mother to identify Dale. He described the strangulation marks on the neck and the victim's purple head. The defendant further described Dale as wearing only a pair of briefs when he was found. At trial, the forensic pathologist testified regarding marks on the body which indicated that the boy had been wearing a pair of jockey

---

1. The defendant was sentenced to life imprisonment by order dated May 9, 1985. Due to the withdrawal of defendant's counsel, and difficulty in obtaining a printed record, the defendant was resentenced on May 8, 1986, and again on March 27, 1987, in order to facilitate an appeal.

2. The lower court never actually sustained the defendant's objection, but rather indicated that it was immaterial how the court ruled since the witness was invoking his Fifth Amendment rights.

shorts after death. Additionally, the defendant's sister testified that on the evening of July 30, 1984, the defendant related the same story to her, adding that he had told the missionaries about Dale's death to get sympathy from them.

The defendant gave his first statement to the police on Thursday, August 2, 1984. The defendant went to police headquarters and asked to speak to the investigating officer, Deputy A.B. Schuck. At that time, the defendant was advised of his *Miranda* rights,[3] and signed a waiver of those rights. He was also informed that he was free to leave at any time and was not under arrest. The purpose for the police questioning the defendant at this time was to gain background information on both the victim and the defendant.

The defendant then voluntarily answered questions posed by the sheriff's department. He stated that he was familiar with the area where Dale's body was found because he had taken Dale there previously to fish and on picnics. Parker also expressed interest in the cause of Dale Mowery's death and stated that he had heard that Dale was dead on August 1, 1984, from two of his friends.

The defendant gave his second statement to the police on Friday, August 3, 1984. The police had asked the defendant to come in for another interview to help clarify some inconsistencies in various statements that they had obtained from both the defendant and other witnesses. Again, the defendant was informed of his Fifth Amendment rights and executed a waiver of those rights on a written form. Police also informed him that he was not under arrest and was free to leave at any time.

According to the testimony of Deputy Schuck, Parker was questioned for approximately two hours from 5:30 p.m. to 7:43 p.m. in order to get more information about Dale Mowery's death. Deputy Schuck stated that the defendant did most of the talking during the interview.

Shortly before 7:45 p.m., the defendant, for the first time, admitted to being a witness to the murder of Dale Mowery. The defendant stated that Richard Starkey (Starkey) killed Dale Mowery and that the defendant had helped Starkey tie the victim to a chair prior to his death. At this point, the police began to tape record the interview with the defendant. He was again asked if he had been informed of and understood his rights. Parker was also informed that he was free to leave at any time and that he had not been placed under arrest at that time. Finally, the defendant indicated he was giving the statement voluntarily and that he did not wish to have an attorney present.

The defendant proceeded to tell the police that on Friday, July 27, 1984, Starkey came by the defendant's apartment looking for Dale Mowery. According to the defendant, Starkey thought that the boy had stolen some drugs from him. On Saturday, July 28, 1984, Starkey found Dale at the defendant's apartment. Starkey threatened Dale and then the defendant and Starkey tied the victim's hands and ankles together. The defendant went into great detail about how Starkey had proceeded to strangle Dale Mowery and then taken the body from the defendant's apartment and disposed of it. Starkey, however, appeared at trial and testified. He established an alibi which was corroborated by three additional witnesses.

According to Deputy Schuck, the defendant confessed to being involved in the murder of Dale Mowery once prior to a tape recorder being turned on, and once after the tape recorder was started. While the defendant contends that the taped statement began at 7:45 p.m. and did not end until 9:15 p.m., the State contends, and the times stated on the tape recording reflect, that the statement was taken between 7:45 p.m. and 8:21 p.m.

After the tape recorded confession was completed, the defendant was placed under arrest and taken to magistrate court for arraignment. He was arraigned on the charge of first degree murder. The defendant also filled out a waiver of rights form and requested court appointed counsel.

---

**3.** *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Due to the lateness of the arraignment (approximately 9:30 p.m. on Friday, August 3, 1984) an attorney was not appointed for the defendant until Monday, August 6, 1984. After the arraignment, the defendant was taken into custody and jailed at approximately 10:00 p.m.

On Monday, August 6, 1984, the defendant made a fourth statement to the police. Over the weekend, he had made numerous requests to speak with either the investigating officer, Deputy Schuck, or Sergeant Woodyard. When the investigating officer arrived for work on Monday, August 6th, he was informed by deputies and correctional officers that the defendant had made repeated requests to speak with him. The defendant was sent for and, upon arriving in the room where Deputy Schuck was waiting, immediately blurted out that he had strangled Dale Mowery, and that Starkey was not involved. Deputy Schuck immediately advised the defendant to remain silent. He was again given *Miranda* warnings and signed a written waiver. The sheriff's department did not advise the defendant regarding his Sixth Amendment right to counsel, nor did they obtain a waiver regarding this right.

The taped confession of August 6th revealed that the defendant had done most of what he had earlier accused Starkey of doing. The murder apparently resulted from a game of cowboys and Indians played to entertain a one-year-old female baby whom the defendant was babysitting. The game got out of control and the defendant ended up strangling the boy.

According to the defendant's mother, Mary Joseph Parker, the defendant telephoned her shortly after his arrest and again confessed to the murder of Dale Mowery. Also, after the confession was completed, he walked outside the room and began to casually discuss the matter with Denny Huggins, whose relationship with the defendant was not identified. He later wrote a letter to his sister concerning the incident where he again confessed to the murder. His sister testified regarding the letter and its contents at trial. The letter was introduced in evidence without objection.

Prior to the trial, the defendant recanted his confession. The defense's theory at trial was that Dale Mowery was killed by or his murder was directed by Paul Sharp, because Sharp feared that the boy would disclose Sharp's illegal business of being a supplier of marijuana to retailers such as Dale Mowery's mother.

At trial, the defendant testified that he had helped Charles Riffle (Riffle), an associate of Sharp, catch Dale Mowery and tie him up on the evening of July 29, 1984, so that the boy could be taken to Sharp. Riffle later returned to the defendant's apartment and told the defendant if he did not forget that he had seen Dale and Riffle that evening, the defendant and his family could end up floating in the creek with a noose around their necks. The defendant offered this fear for his safety and the safety of his family as the reason for his prior inconsistent statements. Both Sharp and Riffle, at trial, denied the defendant's allegations.

The state centered its case on the defendant's confessions. Other evidence offered at trial by the state which tended to corroborate the defendant's confessions that he alone was responsible for Dale Mowery's death included: (1) Fibers were found on the defendant's motorcycle that were similar to those of a red blanket found at the defendant's residence; (2) A trash bag containing caucasian limb hair was found inside the defendant's home; (3) The carpet in the living room floor of the defendant's apartment contained traces of urine. (The defendant had stated that the victim urinated while being strangled); and, (4) Saliva stains were found on a chair taken from the defendant's living room which contained an antigen found in the victim's blood type.

## I.

The appellant's first assignment of error presents the question of whether the defendant was presented before a magistrate after probable cause was established that he committed a crime in compliance with

the prompt presentment statute found in *W.Va.Code* § 62–1–5 [1965].

The defendant contends that the prompt presentment statute was violated because on August 3, 1984, the defendant made an untaped oral confession, after which he was kept at the Wood County Correctional Center so that a taped confession could be conducted. The second confession was obtained after Deputy Schuck felt that probable cause had been established that the defendant had committed the murder or was involved in the murder. Nevertheless, the defendant was not taken to the magistrate until after the taped confession was completed which was, according to the defendant, between 9:15 p.m. and 9:30 p.m. the same day. The defendant argues that the subsequent taped confession on August 3, 1984, is inadmissible as violating the presentment statute, and that the August 6th statement is inadmissible as being a product of the illegally taped statement of August 3rd.

The state contends that the prompt presentment statute was not violated during the thirty-eight minutes it took to record the defendant's statement because: 1) the delay was not designed solely to extract a confession from the defendant; 2) the defendant was intelligent and knowledgeable of his rights; 3) there was no causal connection between the delay and the defendant's decision to confess; and, 4) the recording of the statement protected both the defendant and the state. Since the original statement was lawfully obtained, the subsequent statements were not inadmissible. Further, all the statements eventually became admissible for impeachment purposes only, when the defendant took the stand in his own defense and gave yet another inconsistent statement.

*W.Va.Code* § 62–1–5 [1965] provides

An officer making an arrest under a warrant issued upon a complaint, or any person making an arrest without a warrant for an offense committed in his presence, shall take the arrested person without unnecessary delay before a justice [magistrate] of the county in which the arrest is made. When a person arrested without a warrant is brought before a justice [magistrate], a complaint shall be filed and a warrant issued forthwith. The officer executing the warrant shall make return thereof to the justice [magistrate] before whom the defendant is brought.[4]

■ This Court has previously held that "an unjustifiable and unreasonable delay in taking the accused before a magistrate after his [her] initial arrest may in itself be sufficient to render a confession involuntary." *State v. Persinger,* 169 W.Va. 121, 286 S.E.2d 261, 271 (1982). The focus in reviewing whether unnecessary delay has occurred, however, is the purpose of the delay, rather than the length of the delay. *Persinger,* 169 W.Va. at 138, 286 S.E.2d at 270. Simply stated, did the delay in taking the defendant to the magistrate occur so that a confession might be obtained from the defendant? *Id.* If the evidence indicates it was, then the rule stated in *Persinger* applies and the confession is excluded. If, on the other hand, a "necessary delay" occurs, no violation of the presentment statute would be found.

'Examples of necessary delay might include those required: 1) to carry out reasonable routine administrative procedures such as recording, fingerprinting and photographing; 2) to determine whether a charging document should be issued accusing the arrestee of a crime; 3) to verify the commission of the crimes specified in the charging document; 4) to obtain information likely to be a significant aid in averting harm to persons or loss to property of substantial value; 5) to obtain relevant nontestimonial information likely to be significant in discovering the identity or location of other persons who may have been associated with the arrestee in the commission of the offense for which he was ap-

---

**4.** *See also W.Va.R.Crim.P.* 5(a) which provides, in part, that "[a]n officer making an arrest under a warrant issued upon a complaint or any person making an arrest without a warrant shall take the arrested person without unnecessary delay before a magistrate within the county where the arrest is made...."

prehended, or in preventing the loss, alteration or destruction of evidence relating to such crime.'

*Id.* (Citing *Johnson v. State*, 282 Md. 314, 329, 384 A.2d 709, 717 (1978)).

Upon review of the statements made by the defendant in this case, it becomes clear that the prompt presentment statute was not violated. First, "police investigatory interrogations without presentment to a magistrate are allowable only when the suspect is expressly informed that he is not under arrest, is not obligated to answer any questions and is free to go...." *State v. Mays*, 172 W.Va. 486, 489, 307 S.E.2d 655, 658 (1983). Before the first three statements made by the defendant to the police, the defendant was told that he was not under arrest and was free to leave at any time. Also, the police officers who were present with the defendant during those statements testified that they were still investigating Dale Mowery's death and trying to clear up inconsistencies in various people's statements (including the defendant's) made to the police.

Second, the delay in taking the defendant to the magistrate was a necessary delay according to our decision in *State v. Humphrey*, 177 W.Va. 264, 351 S.E.2d 613 (1986). In *Humphrey* the defendant voluntarily went to the police station to answer questions regarding a murder. 177 W.Va. at 266, 351 S.E.2d at 615. Upon arrival, the defendant was advised of his *Miranda* warnings and was informed that he was free to leave at any time. *Id.* During the questioning, the defendant confessed to the crime. He again was given *Miranda* warnings and signed a waiver of rights form. *Id.* The police then proceeded to make a written statement. This took approximately one hour and fifteen minutes. The defendant signed the statement. *Id.* After obtaining the written statement, the police sought to corroborate the information given to them by the defendant. Consequently, the defendant remained in police custody for approximately one and one-half

hours longer prior to being taken before a magistrate. *Id.* 177 W.Va. at 268, 351 S.E.2d at 615–16.

■ We found the confession made by the defendant in *Humphrey* to be admissible, holding that "[e]ven though the prompt presentment rule was triggered[5] ... the delay occasioned by reducing an oral confession to writing ordinarily does not count on the unreasonableness of the delay where a prompt presentment issue is involved." *Id.* 177 W.Va. at 269, 351 S.E.2d at 617.

■ Similarly, in the present case, the defendant went voluntarily to the police to answer questions. He was given his *Miranda* warnings and signed a waiver. He was also informed that he was not under arrest and was free to leave at any time. He then answered questions from 5:30 p.m. to 7:43 p.m. It was not until approximately 7:43 p.m., that the defendant actually implicated himself in the crime. It is undisputed that at the time the defendant implicated himself, the police had probable cause for arrest and therefore, the prompt presentment statute was triggered. However, as the facts indicate, there was approximately a thirty-eight minute delay in taking the defendant to the magistrate. The *sole* purpose for the delay was to make an oral tape recording of the defendant's earlier statement. There is no evidence in the record that the police did anything other than tape record the statement the defendant had already made. Hence, the delay had no effect on the voluntariness of the statement made by the defendant. Therefore, we hold that just as a delay in reducing an oral confession to writing "does not count on the unreasonableness of the delay," neither does a delay in tape recording an otherwise undocumented statement made by defendant affect the reasonableness of the delay in presenting the individual to a magistrate. Since we find no violation of the prompt presentment statute, the issue of suppression of subsequent statements need not be addressed.

---

**5.** The prompt presentment rule is triggered either when a person is placed under arrest, or when a person is in police custody and there is sufficient probable cause for an arrest. *Humphrey*, 177 W.Va. at 268, 351 S.E.2d at 617.

## II.

The defendant argued that his Sixth Amendment right to counsel was violated when he was questioned by the deputies on August 6th, after his arraignment and request for counsel, but prior to counsel actually being appointed to represent the defendant and prior to the defendant consulting with counsel.

The defendant contends that when the August 6, 1984, statement was made, his Sixth Amendment right to counsel had already attached and the state, therefore, was required to treat him more cautiously. Further, once his Sixth Amendment right attached, it could only be waived by a written waiver signed by the defendant, even if he initiated the contact with the police. The defendant waived his Fifth Amendment rights, in writing, prior to giving the statement, but not his Sixth Amendment rights.

The state contends that the appellant was intelligent and quite knowledgeable of his constitutional rights.[6] He initiated the contact with the police authorities when he confessed to the slaying of Dale Mowery. He was informed of his *Miranda* rights and signed a written waiver of those rights.

In *State v. Crouch*, 178 W.Va. 221, 358 S.E.2d 782 (1987), the defendant requested counsel at his arraignment. The defendant subsequently approached a deputy at the jail and asked if he could talk to her privately. *Crouch*, 178 W.Va. at 222, 358 S.E.2d at 783. He was advised of his rights and signed a written waiver of rights form. *Id.* He then gave the statement to the deputy in which he confessed the crime.

■ We held that " 'if police initiate interrogation after a defendant's assertion,

at an arraignment or similar proceeding, of his right to counsel, any waiver of the defendant's right to counsel for that police-initiated interrogation is invalid.' " *Id.* at 783–84 (citing *Michigan v. Jackson*, 475 U.S. 625, 636, 106 S.Ct. 1404, 1411, 89 L.Ed.2d 631 (1986)); *See also* Syl. Pt. 1, *State v. Barrow*, 178 W.Va. 406, 359 S.E.2d 844 (1987). Further, just because a defendant initiates a conversation with police does not imply that he is waiving his Sixth Amendment right to counsel. *Crouch*, 178 W.Va. at 223, 358 S.E.2d at 784 (citing *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981)). In order to effectively withdraw a request for counsel: "(1) the accused must initiate a conversation; and, (2) must knowingly and intelligently, under the totality of the circumstances, waive his right to counsel." Syl. Pt. 1, *Crouch*, 178 W.Va. at 221, 358 S.E.2d at 782; *See State v. Lucas*, 178 W.Va. 686, 689, 364 S.E.2d 12, 15 (1987).

■ In this case, the defendant requested counsel at his arraignment on Friday night, August 3, 1984. No counsel was appointed prior to his August 6th statement. However, on several occasions over the weekend, according to the testimony at trial, the defendant expressly asked to speak to the investigating officer in his case. This fact shows a willingness on the defendant's part to initiate conversation with the police. When the investigating officer arrived for work on August 6th, he was informed of the defendant's request, and the officer sent for the defendant. According to the deputy's testimony, upon entering the room, the defendant blurted out that he had strangled Dale Mowery and that Richard Starkey was not involved. The defendant was advised to remain silent, he was given his *Miranda* warnings and he signed a written waiver form.[7]

---

**6.** The evidence at trial indicated that the defendant had a high school education along with college courses specifically dealing with constitutional rights as they apply to criminal procedure.

**7.** The defendant at first did not wish to make a formal statement without his sister being present and then apparently changed his mind. The following is an excerpt from the tape re-

cording of the defendant's August 6, 1984, statement:

> Q: Mark, do you understand that you still have, that you have been advised of your rights and that you have a right to counsel at this time?
> A: Yes.
> Q: Are you willing to waive your right to counsel at this time?
> A: Yes.

Further, the defendant had a high school education with college courses in criminal justice so he can not now persuasively argue that he did not know what he was doing. He even testified at trial that he knew he had a right to an attorney at the time the statement was made. It is apparent from the record that the defendant knowingly and intelligently waived his Sixth Amendment right to counsel when he initiated contact with the police for the purpose of confessing to the crime of murder prior to the statement made on August 6, 1984. Therefore, the lower court committed no error involving this matter.

### III.

■ The appellant's final assignment of error is that the trial court incorrectly sustained an objection to the defendant's proffered testimony of John Riel. The testimony would have been that a year before, Riel had attempted to purchase marijuana from Joy Mowery, the victim's mother, and was told by her that she had no marijuana because Sharp had run out of his marijuana supply.

The defendant contends that the proffered testimony was relevant to show that Dale Mowery was killed because of his knowledge that his mother's supplier of marijuana was Paul Sharp. The defendant further contends that this testimony was not hearsay since it was not offered to prove the truth of the matter asserted, but rather for the purpose of showing that the victim's mother had in fact been supplied with marijuana by Sharp. This, the defendant argues, supported the defendant's theory that Sharp had Dale Mowery killed because of the boy's knowledge of Sharp's illegal business.

The state, however, contends that Riel was allowed to answer all questions posed to him by the defendant's counsel. The witness simply refused to answer the questions upon advice of his own counsel, there-

Q: Has anyone ever made any threats or promises to you to cause you to continue with this statement?
A: No.

by invoking his Fifth Amendment right against self-incrimination.

The proffered testimony was as follows: (By Mr. Reed, defendant's attorney)
Q: Did you [John Riel] have any type of conversations with Joy Mowery concerning Paul Sharp other than what you have already testified to?
Mr. Deitzler (Prosecuting Attorney): Excuse me, Your Honor object to the hearsay unless it falls within one of the exceptions.
The Court: I would overrule this objection at this point. The question is whether or not he had other conversations. He may answer the question.
A: Just the part I testified about her owing him money.
Q: Did she ever say whether Paul Sharp was mad at her?
Mr. Deitzler: Objection, leading.
Mr. Reed: Not discussing, just asking a question.
The Court: Are you getting into inadmissible hearsay? I would sustain the objection to that.
Mr. Reed: Do you recall when it was that Joy Mowery told you about owing Paul Sharp money?
A: About a year and a half ago.
Q: Mr. Riel, have you ever bought or attempted to buy drugs from Joy Mowery?
Mr. Deitzler: Objection, don't see the relevance.
The Court: I am having difficulty with the relevance, but I assume the witness is not going to answer anyway?
Attorney (for the witness): That is correct, Your Honor.
The Court: Really immaterial how I rule.
Mr. Reed: We have no further questions for this witness.

First, the hearsay argument raised by the defendant is without merit for the objection made by the state was to the rele-

Q: Before you asked that your sister be present during this statement, are you willing to proceed without her being present?
A: Yeah, if I can talk to her when she does get here.

**628**

vancy of Riel's testimony concerning the purchase of drugs from Sharp. No hearsay statement or potential hearsay statement is involved. *See W.Va.R.Evid.* 801(c); *Compare W.Va.R.Evid.* 401 and 402. Second, the witness called by the defendant refused to answer the question posed by the defense attorney because to answer the question would have meant that the witness could have implicated himself in a crime, i.e., the purchase of illegal drugs. The witness had the right to invoke his Fifth Amendment right against self-incrimination, and the trial court was correct in its ruling on this matter.

Based on the foregoing opinion, we affirm the judgment of the Circuit Court of Wood County.

Affirmed.