439 S.E.2d 881

STATE of West Virginia, Plaintiff Below, Appellee,

v.

Charles R. KILMER, Defendant Below, Appellant.

No. 21504.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 21, 1993.

Decided Dec. 10, 1993.

618

Nancy C. Ulrich, Asst. Pros. Atty., Martinsburg, for appellee.

Frank W. Helvey, Jr., Public Defender Services, Charleston, for appellant.

WORKMAN, Chief Justice:

This case is before the Court upon the March 4, 1991, final order of the Berkeley County Circuit Court denying the Appellant's, Charles R. "Manny" Kilmer's, motion to set aside the verdict and grant a new trial. The Appellant was convicted on January 24, 1991, of first degree murder, without mercy, in the February 16, 1990, homicide of Sharon Lewis, wife of Martinsburg, West Virginia, City Councilman Michael Lewis. The Appellant raises the following assignments of error: 1) the trial court committed reversible error in admitting the Appellant's confession into evidence; 2) the search warrant for hair samples from the Appellant was not supported by probable cause; 3) the failure of the police to tape record the Appellant's custodial interrogation violated the Due Process Clause of the West Virginia Constitution; and 4) the Appellant was denied effective assistance of counsel. Based on a review of the record, the briefs and arguments of the parties, and all other matters submitted before this Court, we find no error was committed by the lower court. Accordingly, we affirm.

On Friday, February 16, 1990, around 1:00 p.m., Martinsburg, West Virginia, police responded to a call at the home of Michael and Sharon Lewis and found the body of Sharon Lewis on the kitchen floor. According to the testimony of Officer Shannon Armel, the victim was brutally beaten and suffered a deep knife wound across her throat. The crime scene evidence indicated that the murder was the result of a violent struggle. Officer Ar-

mel also testified that Mrs. Lewis was fully clothed, still wearing jewelry, including ten rings, and there was no money or property missing from the house, causing police to rule out robbery as a motive for the death.

Sergeant Thomas Gaither and Sergeant George Swartwood, both detectives with the Martinsburg Police Department, testified that they learned through interviews with employees at Mr. Lewis' store, Lewis Paint and Wallpaper, that the Appellant was an occasional handyman for Mr. Lewis and that the Appellant was at the Lewis' home the morning of the murder. The officers testified that the Appellant told them on February 17, 1990, that his friend Donald Morris had driven him to the Lewis home on the morning of February 16, so that the Appellant could repair an indoor light fixture at Michael Lewis' request, but the Appellant denied any knowledge of Mrs. Lewis' death. The officers' testimony indicated that both Donald Morris and the Appellant gave formal statements to the police on Sunday, February 18, 1990. Neither statement was incriminating; however, the officers used the statements to obtain a search warrant for Mr. Morris' car.[1]

On February 20, 1990, the police attempted to execute a search on the Appellant for hair samples. Sergeant Gaither testified that he and Sergeant Swartwood went to the Appellant's home to execute the warrant, but the Appellant was not there. Later that evening, the Appellant called the police department to inquire as to why they were looking for him. The detective stated that the Appellant was advised that they had obtained a search warrant for his hair samples. The Appellant stated that he would voluntarily go to the police department the next morning.

■ Between midnight and 1:00 a.m. on February 21, 1990, the Berkeley County Prosecuting Attorney, Diana Cook Risavi, notified the Martinsburg police that Donald Morris was at attorney Steven M. Askin's office and wanted to give a statement to

---

1. The testimony at trial revealed that the search warrant was for forensic evidence and that examination of Mr. Morris car by the F.B.I. Labo-

ratory in Washington, D.C., disclosed no incriminating evidence.

police about his involvement in Mrs. Lewis' death.[2] The prosecuting attorney contacted the Honorable Patrick G. Henry III, Judge for the Circuit Court of Berkeley County, to have counsel appointed for Mr. Morris. Judge Henry appointed Norwood Bentley as counsel for Mr. Morris. The prosecuting attorney then directed Martinsburg police to take Mr. Morris to Mr. Bentley's office. There, Mr. Morris gave a statement to the police incriminating the Appellant in Mrs. Lewis' murder.[3] Mr. Morris claimed in his statement that he had no prior knowledge that the Appellant intended to murder Mrs. Lewis. He also stated that he learned of the victim's death only after the Appellant returned to the car and told him. Mr. Morris stated that his only participation in the crime was helping the Appellant hide bloody clothing at a roadside dump in an area near the victim's residence known as Flagg's Crossing.

Sergeant Swartwood testified that subsequent to obtaining Mr. Morris' statement, he and two other officers took Mr. Morris to Flagg's Crossing. There the officers retrieved bloody clothing, including a pair of blue jeans, coveralls and a camouflage hat, and a pair of tan work boots with the letters "MAN" on the inside of each boot.[4] All of these articles were introduced into evidence at trial. Based on Mr. Morris' statement and the evidence gathered at Flagg's Crossing, the officers obtained arrest warrants for both the Appellant and Mr. Morris for the murder of Sharon Lewis.

Around 9:00 a.m., on the morning of February 21, 1990, the Appellant and his wife voluntarily arrived at the Martinsburg Police Department. Sergeant Swartwood testified that the Appellant was taken into the Detective's Office, where Sergeant Gaither[5] told him that when the Appellant contacted them the night before,[6] they had only a search warrant to execute, but that other information had been collected since then and they now had an arrest warrant for him for Mrs. Lewis' murder. According to the sergeant, the Appellant responded " 'where's Donald?,' " [7] to which Sergeant Swartwood testified that he advised the Appellant of his Fifth Amendment rights pursuant to *Mi-*

---

2. This information concerning how Donald Morris' statement came about was revealed at an April 20, 1990, hearing before the Circuit Court of Berkeley County as a result Donald Morris' motion to disqualify Steven Askin as counsel for the Appellant.

3. Mr. Morris invoked his Fifth Amendment right to refuse to incriminate himself and refused to testify. His statement was ruled inadmissible at the Appellant's trial because the trial court found that introduction of the statement would violate the Appellant's Sixth Amendment right to confront his accuser. Generally, "[a] confession of an accomplice which inculpates the accused is presumptively unreliable. Where the accomplice is unavailable for cross-examination, the admission of the confession, absent sufficient independent 'indicia of reliability' to rebut the presumption of unreliability, violates the Sixth Amendment right of confrontation." Syl. Pt. 2, *State v. Mullens,* 179 W.Va. 567, 371 S.E.2d 64 (1988); *see* Syl. Pt. 1, *State v. Marcum,* 182 W.Va. 104, 386 S.E.2d 117 (1989).

Further, Mr. Morris was convicted of accessory after the fact in magistrate court prior to the Appellant's trial, and sentenced to a year in jail. This Court has previously held that "[e]ven though one charged in the same indictment as the defendant has entered a guilty plea he may assert his Fifth Amendment rights not to testify in the defendant's trial if he has expressed to the

court his intention to appeal his conviction on his guilty plea." Syl. Pt. 4, *State v. Grimmer,* 162 W.Va. 588, 251 S.E.2d 780 (1979), *overruled in part on other grounds, State v. Petry,* 166 W.Va. 153, 273 S.E.2d 346 (1980). Although the record does not disclose whether Mr. Morris appealed his conviction, we presume that to be the reason Mr. Morris was not compelled to testify. Had Mr. Morris exhausted his right to appeal his conviction, then the circuit court could have compelled his testimony.

4. The significance of the letters "MAN" is that the Appellant often goes by the nickname of Manny.

5. Police Chief Jack Strobridge testified that he was also present at the beginning of the Appellant's statement, but then he left the room.

6. According to Sergeant Gaither's testimony, the police had attempted to execute the search warrant on February 20, 1990, by going to the Appellant's home. The Appellant, however, was not at home. Later that night the Appellant telephoned the police station to find out why they had been looking for him.

7. The Appellant testified at the suppression hearing that he didn't ask about Mr. Morris until after his *Miranda* rights were read.

*randa.*[8] According to the sergeant's testimony, the Appellant acknowledged that he understood his rights. The sergeant then told the Appellant that Donald Morris had been arrested. The Appellant was also informed about the evidence collected at Flagg's Crossing as well as the officers' suspicion that the victim's husband, Michael Lewis, was involved in his wife's death and had gotten the Appellant to commit the murder.

The Appellant told the officers present that he needed to speak with an attorney. Sergeant Swartwood testified that "I asked him what lawyer he wanted and he informed me he wanted Mr. Askin." Sergeant Swartwood got the Appellant a telephone, looked up and dialed Mr. Askin's office number and handed the receiver to the Appellant. The officer testified that he gathered from the Appellant's telephone conversation that Mr. Askin was not in his office. When the Appellant handed the phone back to the sergeant, the sergeant spoke with one of Mr. Askin's employees to find out if the attorney represented the Appellant, but that person did not have this information and the conversation terminated. The sergeant then asked the Appellant if he wanted the officer to contact another attorney for him. The sergeant testified that the Appellant responded to this inquiry by stating "let's do it." Right after this response, the Appellant began explaining the events surrounding the crime. According to Sergeant Swartwood, shortly thereafter, the Appellant was advised by Sergeant Gaither that he could not write as quickly as the Appellant was relaying the information. Sergeant Gaither asked the Appellant if he would like to write the statement or continue to have one of the officers do it for him. The Appellant chose the latter. Also, during this break, Sergeant Swartwood again advised the Appellant of his Fifth Amendment rights; however, it was not until after the Appellant completed his statement that the Appellant signed an acknowledgment that he understood and voluntarily relinquished his rights by signing a waiver of rights form.

The Appellant testified at the suppression hearing regarding his statement that he told Detective Swartwood that he should get an attorney. Detective Swartwood then asked the Appellant which attorney he wanted, to which the Appellant responded Steve Askin. The Appellant further testified that after he unsuccessfully attempted to contact Mr. Askin, Detectives Swartwood and Gaither indicated that Mr. Askin would not take his case anyway. The Appellant testified that the officers afforded him the opportunity to contact another attorney, but he told the officers that Mr. Askin would get back in touch with him. At this point, the Appellant stated that he never said "let's do it;" however, the Appellant responded affirmatively to the following questions posed by the prosecuting attorney: "at some point after that [the attempt to contact an attorney] you did begin to speak with the officers, is that fair to say?" While the Appellant testified that he felt pressure during his encounter with the detectives, he also stated that the officers were not rude to him, nor did they threaten or intimidate him. Finally, the Appellant acknowledged that he made the statement, that he was given *Miranda* warnings a second time, that he signed the waiver of rights form and that he never renewed his initial request for counsel.

The Appellant's statement incriminated himself and Michael Lewis in Sharon Lewis' murder. In the statement, which was admitted at trial, the Appellant related that Michael Lewis had talked to him about Sharon Lewis on several occasions. Mr. Lewis told the Appellant that he was having problems with his wife and that she had threatened him with a knife. Mr. Lewis also told the Appellant that his wife had already made up her mind to commit suicide and so Mr. Lewis suggested to the Appellant that the Appellant help her along. The Appellant met with Mr. Lewis at Mr. Lewis' store prior to the murder, where Mr. Lewis gave the Appellant an envelope containing $2,000, and instructed the Appellant to make Mrs. Lewis' death look like an accident. The Appellant and Mr. Lewis arranged for the Appellant to go to the Lewis home on February 16, 1990, on the pretext of fixing a ceiling light. Donald Morris drove the Appellant to the Lewis home,

---

**8.** *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

but remained in the car. The Appellant murdered Mrs. Lewis, washed the blood from his hair and hands, and found a pair of coveralls to wear over his bloody clothing. He then returned to the car where Mr. Morris was waiting and told Mr. Morris what he had done. The Appellant called Mr. Lewis from a pay telephone and advised him that his wife was dead. Later that same day, the Appellant, accompanied by Mr. Morris, went to Flagg's Crossing to dispose of the Appellant's bloody clothing.

The State also introduced forensic evidence against the Appellant. Specifically, Robert B. Fram, a special agent with the Federal Bureau of Investigation and the State's expert on hair and fibers, testified that head hair consistent with the victim's was found on a metal statue near her body and on the coveralls found at Flagg's Crossing. The expert also testified that beard hair was found in the victim's hand, in her jewelry and her clothes. The significance of the beard hair is that the Appellant had a beard at the time of the murder, with hairs approximating the color of the hairs found at the murder scene; but, forensic analysis of whether the hairs were from the Appellant's beard proved inconclusive.

The State also offered the testimony of John Roy Brown, a serology expert and special agent with the Federal Bureau of Investigation. Special Agent Brown testified that a trace of human blood was found near the kitchen knife handle which the Appellant had identified in his statement to police. The blood, however, could not be blood-typed. DNA testing of the blood on the blue jeans found at Flagg's Crossing and on the statue at the murder scene was consistent with the victim's blood, according to Special Agent Brown.

The Appellant did not take the stand. The Appellant's defense basically consisted of an attack on the quality and reliability of the State's criminal investigation as well as his contention that the statement was unlawfully obtained.

### I.

The first issue addressed by the Court is whether the Appellant, after invoking his Fifth Amendment right to counsel, waived that right prior to giving an incriminating statement to the police. The Appellant argues that the trial court erred in ruling that the Appellant's confession, made after the Appellant invoked his right to counsel, was not the product of interrogation; that the Appellant initiated conversation with the police about the victim's murder with what the trial court characterized as the "non-responsive comment" of "let's do it;" and that the Appellant's statement was made voluntarily, knowingly and intelligently was not, therefore, in violation the Appellant's Fifth Amendment right against self-incrimination. The Appellant also maintains that the Appellant did not make a voluntary, knowing and intelligent waiver of his Fifth Amendment right based upon the following allegations: the inappropriate police questioning of the Appellant concerning his choice of an attorney; the pressure police asserted on the Appellant to communicate immediately with his attorney in their presence; the police denigrating the Appellant's right to appointed counsel which would not have occurred had the Appellant been arraigned prior to his making the statement; the police questioning Steve Askin's staff about the attorney's representation of the Appellant; the police asking the Appellant whether there was another attorney he would like to contact when it was determined that Mr. Askin was unavailable; and, the failure by police to take the Appellant to a magistrate without undue delay in violation of the prompt presentment statute. *See* W.Va.Code § 62–1–5 (1992).

In contrast, the Appellee maintains that the trial court did not commit error in ruling that the Appellant's confession was admissible because the Appellant effectively recanted his request for counsel when he knowingly and intelligently expressed his desire to give a statement in the Lewis murder after having been re-apprised of his *Miranda* rights, including the right to remain silent and the right to counsel, by saying "let's do it" and proceeding to speak of his involvement in the crime. Moreover, the Appellant was not unreasonably detained before being taken to a magistrate as he was only in police custody for approximately two hours, during which

time he gave an eight and one-half page statement and routine administrative procedures such as booking and fingerprinting were performed.

## A. ASSERTION OF RIGHT TO COUNSEL

The United States Supreme Court's decision in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) stands for the fundamental principle that prior to custodial interrogation, a defendant must be advised that he has the right to remain silent and that he has a right to an attorney. *Id.* at 479, 86 S.Ct. at 1630. The Supreme Court further indicated that if a defendant, upon being advised of these rights, states either that he wishes to remain silent or that he wishes to have an attorney present, then all police interrogation must cease. *Id.* at 474, 86 S.Ct. at 1628. While "the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement[,]" such a waiver must not be the result of the defendant being "threatened, tricked, or cajoled" by the police. *Id.* at 479 and 476, 86 S.Ct. at 1630 and 1628.

In *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) the United States Supreme Court implemented additional safeguards to be utilized when a defendant actually requests counsel:

> when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights.... "[A]n accused ... having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, *unless the accused himself initiates further communication, exchanges, or conversations with the police.* (emphasis added)

*Id.* at 484–85, 86 S.Ct. at 1885 (footnote omitted).

This Court previously examined the Fifth Amendment right to counsel in *State v. Bowyer*, 181 W.Va. 26, 380 S.E.2d 193 (1989). In *Bowyer*, the defendant was apprehended for unlawful entry and taken to the police station in Huntington, West Virginia. Once at the station, he was advised of his *Miranda* rights. Prior to taking a statement from the defendant, a police officer asked the defendant " 'Are you willing at this time without an attorney present to answer any questions in reference to this breaking and entering?' " *Id.* at 27, 380 S.E.2d at 194. The defendant responded: " 'No, sir.' " *Id.* The police officer then asked the defendant if he wanted to have a lawyer now or if he wanted to give a short statement to the officer. The defendant responded " 'I will give you a short statement but I don't really have nothing to say[.] I don't know what was really going on up there.' " *Id.* Finally, after more questioning by the officer regarding whether the defendant wanted to voluntarily give a short statement, the defendant did make an incriminating statement to the police. *Id.* This confession was admitted in evidence at trial. *Id.*

■ Following the United States Supreme Court decisions in *Miranda* and *Edwards*, we held in syllabus point 2 of *Bowyer* that "[o]nce an accused asks for counsel during custodial interrogation, he is not subject to further interrogation by the authorities until counsel has been made available to him, *unless the accused himself initiates further communication, exchanges, or conversations.*" 181 W.Va. at 27, 380 S.E.2d at 194 (emphasis added). Thus, this Court found that the trial court improperly admitted the defendant's statements at trial because the defendant had unequivocally invoked his right to an attorney and the defendant's subsequent statements were the result of the officer's further interrogation. *Id.* at 31, 380 S.E.2d at 198.

In the present case the evidence clearly demonstrates that the Appellant not only requested to speak with an attorney he named, but also attempted to make contact with that attorney by telephone, thereby unequivocally asserting his right to an attorney.

Where nothing about the request for counsel or the circumstances leading up to the request would render it ambiguous, all

questioning must cease. In these circumstances, an accused's subsequent statements are relevant only to the question whether the accused waived the right he had invoked. Invocation and waiver are entirely distinct inquiries, and the two must not be blurred by merging them together.

*Smith v. Illinois,* 469 U.S. 91, 98, 105 S.Ct. 490, 494, 83 L.Ed.2d 488 (1984). Therefore, the focus becomes: 1) did the officers' questions following the Appellant's request for an attorney constitute an interrogation?; and, 2) did the Appellant waive his right to an attorney by stating to the officers "let's do it" and proceeding on his own initiative to give a statement?

### B. FURTHER INTERROGATION

Interrogation has been defined by the United States Supreme Court as "express questioning ... [or] any words or actions on the part of the police ... that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 1689–90, 64 L.Ed.2d 297 (1980) (footnotes omitted). Further, the "definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response." *Id.* at 302, 100 S.Ct. at 1690 (footnote omitted).

In the present case, the sergeant's questioning of lawyer Askin's staff concerning whether the Appellant was represented by him and the sergeant's inquiry as to whether there was another attorney whom the Appellant wished to contact cannot be equated with an attempt by the police officers to elicit incriminating information from the Appellant. What the record indicates is that the officers were simply trying to carry out the Appellant's request for counsel before any questioning occurred. Even the Appellant's own testimony at the suppression

hearing failed to reveal any police conduct which could be equated to an interrogation. The Appellant testified that the officers were not rude, nor did they threaten him in any way. They asked no further questions which reasonably could be construed as intended to elicit information of an incriminating nature. While the Appellant indicated that he felt an overwhelming amount of pressure, there is a lack of any evidence that the police were exerting pressure on the Appellant to *immediately* obtain counsel as the Appellant would have this Court believe. Consequently, there is no evidence to indicate the officers should have reasonably known that their attempts to assist the Appellant in obtaining counsel would have been reasonably likely to elicit an incriminating response from the Appellant. *See Innis,* 446 U.S. at 302, 100 S.Ct. at 1690.

### C. WAIVER OF RIGHT TO COUNSEL

"For a recantation of a request for counsel to be effective: (1) the accused must initiate a conversation; and (2) must knowingly and intelligently, under the totality of the circumstances, waive his right to counsel." Syl. Pt. 1, *State v. Crouch,* 178 W.Va. 221, 358 S.E.2d 782 (1987); *accord State v. Angel,* 173 W.Va. 620, 625, 319 S.E.2d 388, 394 (1984). According to the testimony of the investigating officers, the Appellant initiated conversation with them by stating "let's do it," [9] then proceeding to make a statement regarding his role in the murder of Mrs. Lewis. The testimony also reflected that the Appellant began giving his statement so rapidly that Sergeant Gaither asked the Appellant whether he preferred to write his own statement or have one of the officers write it for him. Furthermore, the statement was given to police despite Sergeant Swartwood readvising the Appellant of his *Miranda* warning.[10] According to the Appellant's testimony at the suppression hearing, the only real conflict in this evidence was that he never said "let's do it." However, the Appellant did testify that following the attempts to

---

**9.** While the Appellant intimated during oral argument that the Appellant's response, "let's do it" may have meant "get me another attorney," the fact remains that this was followed by the Appellant initiating his statement to police without any further inquiry by police.

**10.** The evidence also indicated that the Appellant initialled every page of his statement and signed a waiver of rights form, even though the waiver was not signed until the Appellant had completed his statement to police.

get him an attorney, he initiated a conversation with the police. Thus, even the Defendant's evidence supports the State's contention that the Appellant recanted his previous request for counsel by initiating conversation with the police.

### D. VOLUNTARINESS OF WAIVER

■ Our analysis now moves to the issue of whether the Appellant knowingly and voluntarily relinquished his right to an attorney. The Appellant maintains he did not knowingly and voluntarily waive this right because the police violated the prompt presentment statute, West Virginia Code § 62–1–5,[11] by failing to present the Appellant before a magistrate without unnecessary delay. The evidence indicates that the Appellant voluntarily went to the police department. The officers informed him that they had a warrant for his arrest and read his *Miranda* warnings. Based on the fact that the police had already obtained an arrest warrant, the prompt presentment rule was triggered at the time the Appellant walked into the department. *See State v. Humphrey,* 177 W.Va. 264, 268, 351 S.E.2d 613, 617 (1986) (prompt presentment rule triggered either when person is placed under arrest or person is in police custody and sufficient probable cause for arrest is present). "The delay in taking the defendant to a magistrate may be a critical factor where it appears that the primary purpose of the delay was to obtain a confession from the defendant." Syl. Pt. 6, *State v. Persinger,* 169 W.Va. 121, 286 S.E.2d 261 (1982). However, in *Humphrey,* this Court determined that the failure of the police to take the defendant to a magistrate for approximately one and one-half hours did not render the defendant's confession inadmissible at trial because "[t]he delay occasioned by reducing an oral confession to writing ordinarily does not count on the unreasonableness of the delay where a prompt presentment issue is involved." 177 W.Va. at

265, 351 S.E.2d at 614. Syl. Pt. 3; *see also State v. Parker,* 181 W.Va. 619, 383 S.E.2d 801 (1989).

■ As in the *Humphrey* case, the Appellant in the instant case voluntarily went to the police department to submit to a search warrant. He was informed that the police had obtained an arrest warrant and he was twice given *Miranda* warnings. Further, the evidence reveals that he voluntarily initiated his confession with the police; and although there was an approximate two-hour delay in taking the Appellant before a magistrate, the sole purpose of this delay was not to obtain a confession, but rather to reduce the Appellant's eight and one-half page oral statement to writing. There is no evidence that the police did anything to delay taking the Appellant before a magistrate other than write out the oral confession as it was voluntarily given. Hence, the delay had no effect on the voluntariness of the Appellant's confession.

### II.

The next issue is whether the search warrant for hair samples was supported by probable cause. The search warrant, issued on February 21, 1990, for "known samples of head, facial and body hair of Charles Kilmer" was accompanied by the following affidavit:[12]

> On February 16, 1990 the body of Sharon Lewis was discovered in her home located at 407 S. Queen St. Martinsburg, WV. Dr. Jack Frost concluded that the death was caused by bleeding from wounds to the victims (sic) throat.
>
> Investigation has revealed the following information:
>
> Statements from the victims (sic) husband, Michael Lewis indicate he and his wife had been having marital difficulties. These problems have resulted in physical confrontations between Michael Lewis and the victim. Micheal (sic) Lewis admitted to having an (sic) a sexual relationship with

---

11. West Virginia Code § 62–1–5 provides, in pertinent part:
 An officer making an arrest under a warrant issued upon a complaint, or any person making an arrest without a warrant for an offense committed in his presence, shall take the arrested person without unnecessary delay before a justice [magistrate] of the county in which the arrest is made. . . .

12. Both the search warrant and the affidavit were prepared by Sergeant Gaither on February 16, 1990.

another women. (sic) The victim had previously talked with Tammy Stanley and stated that she was contemplating talking to an attorney abut divorce proceedings against Micheal (sic) Lewis.

Statements from Sue Henry, an employee of Micheal (sic) Lewis, reveal that Sue Henry believed that Micheal (sic) Lewis was in love with her. Sue Henry admits to having a sexual relationship with Micheal (sic) Lewis and stated that Micheal (sic) Lewis had told her that he loved her. A statement taken from Donald Morris revealed that he and Charles Kilmer occasionally worked for Micheal (sic) Lewis in the capacity of construction and/or maintenance workers. Mr. Morris also admitted to having been at 407 S. Queen Street on February 16, 1990 at 9 a.m. He stated that he had transported Charles Kilmer to the residence to repair a light in the Lewis home. Morris stated that he waited in his vehicle, a 1976 Ford Granada, brown in color, which is listed on line seven of the attached search warrant. Charles Kilmer entered the residence and stayed for 15 or 20 minutes. Kilmer returned to the vehicle and both men left the residence.

A (sic) interview with Charles Kilmer revealed that he went to 407 S. Queen St. on 2–16–90 at aprox (sic) 9 a.m. He stated that he was going to repair a light in the bedroom of the home. When he arrived, the victim was in the residence. He stated that she left while he was at the residence and did not return during the time that he was there. He finished repairing the light and returned to the vehicle.

On 2–16–90 a search warrant was executed at Lewis Hardware Store in Martinsburg, WV[.] During this search, two envelopes were discovered in a desk drawer that is normally used by Micheal (sic) Lewis. These envelopes contained large sums of cash.

Conclusions of Dr. Frost and investigating officers estimate the victim died between 8 a.m. and 9:30 a.m. on 2–16–90.

The Appellant maintains that the search warrant was supported only by background information in the affidavit. The Appellant bases this assertion on the fact that the following information was not contained in the affidavit: 1) Donald Morris had implicated the Appellant in the victim's murder; 2) the Appellant had already confessed and been arrested for the murder; and 3) the hair samples were relevant to the investigation because foreign hair samples were found at the crime scene. Accordingly, the Appellant asserts that the affidavit lacked probable cause and the corresponding search warrant was issued in violation of the his Fourth Amendment rights. In contrast, the State argues that the warrant, supported by the affidavit, established probable cause, since the police officer provided information in the affidavit that placed the Appellant at the crime scene at the approximate time the crime was committed.

 "Both the Fourth Amendment to the United States Constitution and Article III, Section 6 of the West Virginia Constitution provide that no warrant shall issue except upon probable cause supported by oath or affirmation." Syl. Pt. 3, in part, *State v. Adkins,* 176 W.Va. 613, 346 S.E.2d 762 (1986). " 'To constitute probable cause for the issuance of a search warrant, the affiant must set forth facts indicating the existence of criminal activities which would justify a search....' " Syl. Pt. 5, in part, *State v. Hlavacek,* 185 W.Va. 371, 407 S.E.2d 375 (1991) (quoting Syl. Pt. 1, in part, *State v. Stone,* 165 W.Va. 266, 268 S.E.2d 50 (1980)). Further, "[u]nder the Fourth Amendment to the United States Constitution and Article III, Section 6 of the West Virginia Constitution, the validity of an affidavit for a search warrant is to be judged by the totality of the information contained in it. Under this rule, a conclusory affidavit is not acceptable...." Syl. Pt. 4, in part, *Adkins,* 176 W.Va. at 614–15, 346 S.E.2d at 764. Finally, "[r]eviewing courts should grant magistrates deference when reviewing warrants for probable cause." Syl. Pt. 5, in part, *State v. Thomas,* 187 W.Va. 686, 421 S.E.2d 227 (1992).

 While the affidavit in the present case is by no means the most artfully drafted, it does convey to the magistrate that the Appellant was suspected of "conspiring to kill and slay one Sharon Lewis;" that the Appellant was linked to Mr. Lewis in that he occasionally worked for the victim's husband;

and that the officer had information which placed the Appellant at the crime scene in close proximity to its commission. "To obtain a warrant, the police are required only to show enough evidence to convince the judge (or magistrate) that the police have reason to believe that probable cause exists. The police need not reveal all evidence in the case." *Thomas*, 187 W.Va. at 694, 421 S.E.2d at 235. The affidavit does contain some extraneous background material; but, given the totality of the circumstances, especially the fact that the Appellant was placed at the victim's residence near the time she was murdered, we are convinced that sufficient information was presented to the magistrate via the affidavit to support a finding of probable case, justifying the issuance of the search warrant for hair samples. Therefore, the trial court committed no error in upholding the search [13] conducted pursuant to said warrant.

## III.

■ The next issue is whether the failure of the police to tape record the Appellant's custodial interrogation violated the Due Process Clause [14] of the West Virginia Constitution.[15] The Appellant maintains that because the police elected not to electronically record their interrogation of the Appellant a critical gap went on as to what actually occurred. Because of this alleged gap, the Appellant argues that he was denied due process under the West Virginia Constitution which may provide a defendant more rights than the federal constitution. *See* Syl. Pt. 1, *State v. Bonham*, 173 W.Va. 416, 317 S.E.2d 501 (1984). The State, however, asserts that while there are some instances where the use of audio and videotaping of custodial interrogations would be very helpful, requiring police agencies to record interrogations is impractical and does not offer any greater safeguards for protecting the accused's rights than would be afforded by writing the statements affords.

■ This Court has previously addressed this issue in *State v. Nicholson*, 174 W.Va. 573, 328 S.E.2d 180 (1985). In *Nicholson*,

---

13. The Appellant also argues that the trial court's ruling upholding the search violates the following statement by the United States Supreme Court in *Schmerber v. California*, 384 U.S. 757, 769–70, 86 S.Ct. 1826, 1835, 16 L.Ed.2d 908 (1965) that "[t]he interests in human dignity and privacy which the Fourth Amendment protects forbid any such intrusions [beyond the body's surface] on the mere chance that desired evidence might be obtained." (emphasis added). Specifically, the Appellant relies upon the trial court's holding that "[w]e [magistrates and judges] know that at the time [of] commission of offenses, sometimes hair is found at the scene of the crime. Common sense tells us that. It need not be necessarily set forth in an affidavit." The Appellant equates the trial court's use of "sometimes" to the use of "chance" in *Schmerber* and further asserts that since a laboratory technician pulled the desired hair samples out by the root, this type of intrusion, beyond the body's surface, is forbidden. *See id.* The Supreme Court in *Schmerber*, however, upheld the withdrawal of the petitioner's blood for a blood-alcohol test and further indicated that such intrusions, while subject to the Fourth Amendment, may be warranted. We conclude that since a valid search warrant existed, the taking of the hair samples was not an unreasonable bodily intrusion. *See State v. Gammill*, 2 Kan.App.2d 627, 629, 585 P.2d 1074, 1078 (1978) (holding that procurement of hair sample by plucking out pubic hair follicle from beneath the skin surface is bodily intrusion, but not improper if valid search warrant exists).

14. Article 3, § 10 of the West Virginia Constitution provides that "[n]o person shall be deprived of life, liberty, or property, without due process of law, and the judgment of his peers."

15. The Appellant recognizes that the Due Process Clause of the United States Constitution as interpreted by the United States Supreme Court in *California v. Trombetta*, 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984) would not recognize a denial of due process for the failure of police to record a custodial interrogation. In *Trombetta*, the Supreme Court, in concluding that the Due Process Clause does not require police to preserve breath samples in order to introduce breath-analysis test results at trial, held that in order to place a constitutional duty upon police to preserve evidence the "standard of constitutional materiality" must be met. *Id.* at 491 and 488–89, 104 S.Ct. at 2535 and 2534. To meet that standard, "evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id.* at 489, 104 S.Ct. at 2534. *See Stephan v. State*, 711 P.2d 1156, 1160 (Alaska 1985) ("custodial interrogations need not be recorded to satisfy the due process requirements of the United States Constitution, because a recording does not meet the standard of constitutional materiality").

the appellant argued that it was unfair to allow the state to introduce in evidence the appellant's confession which was written by a state police officer, but signed by the appellant. *Id.* at 577, 328 S.E.2d at 183. This Court stated:

> [i]n a roundabout way, the appellant asks this Court to fashion a rule that would require an interrogating official to record a suspect's interrogation. While this Court recognizes that there are certain merits to this suggestion, we believe that, on balance, such a requirement is impractical logistically, unnecessary given other protections that our system of interviewing suspects already provides, and, finally, in conflict with established precedent.

*Id.,* 328 S.E.2d at 183–84. We then held in syllabus point 2 of *Nicholson* that

> [a] confession or statement made by a suspect is admissible if it is freely and voluntarily made despite the fact that it is written by an arresting officer if the confession or statement is read, translated (if necessary), signed by the accused and admitted by him to be correct.

*Id.* at 574, 328 S.E.2d at 181.

The Appellant relies heavily on the minority position [16] of the Supreme Court of Alaska in the *Stephan* case for the proposition that we should overrule our decision in *Nicholson* and find that failure to electronically record a custodial interrogation constitutes a violation of a defendant's due process rights under the West Virginia Constitution. *See Stephan,* 711 P.2d at 1159 (holding electronic recording of interrogation of suspect is "a requirement of state due process when the interrogation occurs in a place of detention and recording is feasible").

▇▇▇▇ While there are instances where our state constitution may afford a defendant a higher standard of protection than the federal constitution, based on our decision in *Ni-*

*cholson,* we decline to expand the Due Process Clause of the West Virginia Constitution, Article III, § 10, to encompass a duty that police electronically record the custodial interrogation of an accused. *See* 174 W.Va. at 577, 328 S.E.2d at 183–84; *see also Bonham,* 173 W.Va. at 417, 317 S.E.2d at 502, Syl. Pt. 1. In refusing to expand the Due Process Clause of the West Virginia Constitution, we reiterate our position espoused in *Nicholson* that it would be the wiser course for law enforcement officers to record, either by videotape or by electronic recording device, the interrogation of a suspect where feasible and where such equipment is available, since such recording would be beneficial not only to law enforcement, but to the suspect and the court when determining the admissibility of a confession. However, we decline to establish an absolute rule requiring such recording. Accordingly, we find that the trial court did not commit reversible error in admitting the Appellant's statement without a tape recording of that statement.

### IV.

The final issue before the Court is whether the Appellant was denied effective assistance of counsel. This issue focuses primarily upon the following handwritten agreement, drafted on February 22, 1990, in the Appellant's presence, by the Appellant's attorney at trial, Steve Askin, and signed by the Appellant:

> I want to employ Mr. Askin to represent me with the knowledge that he is accepting my case to defend me by either going to trial or accepting a plea of no greater than voluntary manslaughter which carries a sentence of 1–5 years in the penitentiary.
>
> He has advised me that he would today decline to represent me if I am seeking an attorney to negotiate a plea bargain wherein I would seek to plead guilty to

---

**16.** The majority position on this issue is that the due process clause in various state constitutions do not require that custodial interrogations be electronically recorded. *See People v. Raibon,* 843 P.2d 46, 49 (Colo.App.1992); *Coleman v. State,* 189 Ga.App. 366, 375 S.E.2d 663, 664 (1988); *State v. Rhoades,* 121 Idaho 63, 73, 822 P.2d 960, 970 (1991), *cert. denied,* —— U.S. ——, 113 S.Ct. 962, 122 L.Ed.2d 119 (1993); *State v.*

*Buzzell,* 617 A.2d 1016, 1018 (Me.1992); *Williams v. State,* 522 So.2d 201, 208 (Miss. 1988); *State v. James,* 858 P.2d 1012, 1017–18 (Utah App.1993); *State v. Gorton,* 149 Vt. 602, 605–06, 548 A.2d 419, 421–22 (1988); *State v. Spurgeon,* 63 Wash.App. 503, 504–07, 820 P.2d 960, 961–63 (1991), *appeal denied,* 118 Wash.2d 1024, 827 P.2d 1393 (1992); *Gale v. State,* 792 P.2d 570, 588 (Wyo.1990).

either 1st or 2nd degree under (sic) which carries sentence of life w/o eligibility of parole—life with eligibility after 10 years of confinement or 5–18 years in the penitentiary in return for testimony testimony (sic) about some other person who is charged or to be charged with involvement in the death of Sharon Lewis.

He has advised me that he is not interested in representing someone who merely wants to be a witness in return for pleading guilty to 2nd degree murder or 1st degree murder, and has informed me that he feels any attorney can accomplish this goal for me if I'm to be a witness for the State of W.Va. against anyone they wish to convict.

The Appellant maintains that this agreement impeded the attorney-client relationship since the decision to enter a plea agreement should have rested solely with the Appellant and he should have been able to seek the unencumbered advice of his attorney regarding this issue. The Appellant also asserts that a conflict of interest was created when the Appellant's attorney also conferred with the victim's husband,[17] Michael Lewis, who was also seeking legal representation.[18] In contrast, the Appellee argues that it is insufficient to allege ineffective assistance of counsel without a showing of prejudice to the accused resulting for counsel's actions and since the State did not offer any plea agreements to the Appellant, he was not prejudiced by his counsel's conduct.

 The standard for reviewing an ineffective assistance of counsel claim is:

In the determination of a claim that an accused was prejudiced by ineffective assistance of counsel violative of Article III, Section 14 of the West Virginia Constitution and the Sixth Amendment to the United States Constitution, courts should measure and compare the questioned counsel's performance by whether he exhibited the normal and customary degree of skill possessed by attorneys who are reasonably knowledgeable of criminal law, except that proved counsel error which does not affect the outcome of the case, will be regarded as harmless error.

Syl. Pt. 19, *State v. Thomas*, 157 W.Va. 640, 203 S.E.2d 445 (1974). Further, "[w]here a counsel's performance, attacked as ineffective, arises from occurrences involving strategy, tactics and arguable courses of action, his conduct will be deemed effectively assistive of his client's interests, unless no reasonably qualified defense attorney would have so acted in the defense of an accused." *Id.* at 643, 203 S.E.2d at 449, Syl. Pt. 21.

 Regarding the Appellant's claims of ineffective assistance of counsel based upon the agreement demanded by Mr. Askin as a condition of representing Mr. Kilmer, and the consequent inherent conflict of interest demonstrated by the Appellant's attorney, this Court has previously recognized in *State v. Sandler*, 175 W.Va. 572, 573, 336 S.E.2d 535, 536 (1985) that "[n]egotiating a favorable plea bargain is an integral part of a defense attorney's job." The defense attorney's job also involves representing his client in a manner which does not offend the Rules of Professional Conduct. Specifically, the comments to Rule 1.7[19] of the Rules of Profes-

---

**17.** According to the Appellant's brief as well as the Appellant's Exhibit A, a newspaper interview with Mr. Askin, Mr. Askin met with both the Appellant and Mr. Lewis for a total of approximately six hours at the Eastern Regional Jail on February 22, 1990, prior to accepting the Appellant as his client.

**18.** The record also indicates that Donald Morris filed a motion for the disqualification of the Appellant's attorney from the Appellant's case based upon a conflict of interest. After a hearing on the matter, the trial court refused to grant the motion.

**19.** Rule 1.7 of the Rules of Professional Conduct provides:

(a) A Lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:
(1) the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and
(2) each client consents after consultation.
(b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:
(1) the lawyer reasonably believes the representation will not be adversely affected; and
(2) the client consents after consultation. When representation of multiple clients in a single matter is undertaken, the consultation

sional Conduct pertaining to conflict of interests, provide that the defense attorney has a duty of loyalty to his client. "Loyalty to a client is ... impaired when a lawyer cannot consider, recommend or carry out an appropriate course of action for the client because of the lawyer's other responsibilities or interests. The conflict in effect forecloses alternatives that would otherwise be available to the client." *See id.*

We find the agreement between the Appellant and Mr. Askin disturbing. It suggests on its face that Mr. Askin may very well be subordinating his client's best interests in order to promote the lawyer's self-interest or to benefit the interest of another (Mr. Lewis). This conduct, as well as Mr. Askin's alleged contemporaneous six-hour meetings with both Mr. Lewis and the Appellant creates at minimum an appearance of impropriety, and may indeed amount to a violation of the Code of Professional Responsibility.[20] The record in the present case, however, indicates that no plea agreement was ever offered by the State. Nothing in the agreement with Askin, however, precluded the Appellant from actually seeking a plea agreement through other counsel or otherwise. Whether the attorney-client relationship may have been impeded by the representation agreement to the extent that Mr. Askin rendered ineffective assistance of counsel and whether the Appellant meets the requisite burden of proving prejudice[21] for the pur-

poses of an ineffective assistance of counsel claim resulting from this conduct should be further explored through a habeas corpus proceeding. *See* Syl. Pt. 19, *Thomas,* 157 W.Va. at 643, 203 S.E.2d at 449.

As we stated in syllabus point 10 of *State v. Triplett,* 187 W.Va. 760, 421 S.E.2d 511 (1992):

It is the extremely rare case when this Court will find ineffective assistance of counsel when such a charge is raised as an assignment of error on a direct appeal. The prudent defense counsel first develops the record regarding ineffective assistance of counsel in a habeas corpus proceeding before the lower court, and may then appeal if such relief is denied. This Court may then have a fully developed record on this issue upon which to more thoroughly review an ineffective assistance of counsel claim.

Based on the foregoing opinion, the decision of the Circuit Court of Berkeley County is hereby affirmed.

Affirmed.

---

shall include explanation of the implications of the common representation and the advantages and risks involved.

**20.** We are directing the Clerk of the Court to forward a copy of the record, transcript and all other matters submitted before this Court pertaining to this case to the Committee on Legal Ethics of the West Virginia State Bar for further investigation.

**21.** The Appellant argues that he has already demonstrated the showing of prejudice required by

*Thomas* since the record affirmatively shows no reasonable possibility exists for his counsel's unusual action except representation of conflicting interest; hence, Mr. Askin's negotiation with both the Appellant and Mr. Lewis for his legal services, and the representation agreement drafted by Mr. Askin, detrimental to the Appellant but favorable to Mr. Lewis, plainly illustrates Mr. Askin's divided loyalties. *See* 157 W.Va. at 643, 203 S.E.2d at 449, Syl. Pt. 19.