847 A.2d 530

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v.
THOMAHL S. COOK, DEFENDANT–APPELLANT.

Argued November 5, 2003—Decided May 10, 2004.

534

*Marcia H. Blum,* Assistant Deputy Public Defender, argued the cause for appellant (*Yvonne Smith Segars,* Public Defender, attorney).

*Paul H. Heinzel,* Deputy Attorney General, argued the cause for respondent (*Peter C. Harvey,* Attorney General of New Jersey, attorney).

*Leslie Stolbof Sinemus* argued the cause for amicus curiae, Association of Criminal Defense Lawyers of New Jersey.

*Marcia N. Levy, Steven A. Drizin,* a member of the Illinois bar, and *Barry C. Scheck,* a Member of the New York and California bars, submitted a brief on behalf of amici curiae Northwestern University School of Law's Center on Wrongful Convictions, Inno-

cence Project at Benjamin N. Cardozo School of Law and Rutgers University Law School Innocence Project for Justice (*Ms. Levy*, attorney; *Ms. Levy, Mr. Drizin and Mr. Scheck*, on the brief).

Justice LaVECCHIA delivered the opinion of the Court.

Defendant Thomahl Cook appeals his conviction for the purposeful and knowing murder of Katrina Suhan. He asserts various arguments contending that his statements to investigating law enforcement officers improperly were admitted into evidence. Among them, defendant urges us to find that state due process requirements impose on police officers a duty to record electronically an accused's statements made during a custodial interrogation, and that the failure to record requires suppression of his incriminatory statements. Defendant also argues that the trial court erred in refusing to admit evidence that suggested the guilt of an unidentified third party and that the verdict was against the weight of the evidence.

We find no reversible error and, therefore, affirm the judgment of conviction entered against him. In respect of the assertion that custodial interrogations must be recorded electronically, we decline to expand the due process requirements of the New Jersey Constitution to encompass a duty that the police record electronically a custodial interrogation, and note specifically the absence of any legislative action to support such a requirement. That said, we conclude that, as part of our supervisory authority over the criminal justice system, we will establish a committee to examine and make recommendations on the use of electronic audio and video recording of custodial interrogations. The committee shall seek input from the competing interests of law enforcement, at the State and local levels, and the public defender and the criminal defense bar. In sum, we conclude that it would be inappropriate to impose sweeping changes in law enforcement practices of the sort advanced by defendant without notice and without permitting thorough consideration of the policy and financial implications of those changes.

## I.

The facts necessary to the disposition of the issues on appeal are recited below. They have been gleaned from the record developed during pre-trial motion applications and at trial.

Fifteen-year-old Katrina Suhan was murdered sometime in the early morning hours of Saturday, February 14, 1998. She was seen last on that date at about 12:30 a.m., walking home from Roller Magic, a South Amboy roller-skating rink where she and her girlfriends frequently skated. A friend who had been with her, classmates driving by, and a security guard closing the rink, saw her walking alone on Stevens Avenue in South Amboy. Ordinarily it would have been at least a fifteen-minute walk from the rink to her home. At sometime between 12:30 and 1:00 a.m., a resident of Stevens Avenue heard a male and a female arguing outside his window. The male voice was saying "Come on. Let's go," and the female voice was saying, "No, I'm not going nowhere with you." Shortly thereafter, the resident thought he heard a scream come from across the street. Another neighbor on Stevens Avenue also heard a girl screaming, "Leave me alone. Don't touch me. Help me" at approximately 12:15 a.m. That resident testified that she heard two male voices urging the girl to "shut up" and to "be quiet."

Katrina's body was found on the afternoon of Sunday, February 15 in a rough wooded lot behind the Hill Lanes bowling alley located in the neighboring town of Old Bridge. The bowling alley was approximately three miles from where Katrina was last seen. She had been brutally beaten. Her body was positioned face downward and a jacket covered her head; her pants had been pulled below her waist. Large pieces of concrete lay atop her hands and head and an overturned red shopping cart was situated in front of, and partially on, her body. A trail of blood led to the body and to several rocks near her head. A forensic pathologist expressed the view that Katrina died of blunt trauma injury to the head. There was injury also to her left breast that was consistent

with a bite mark; there were no other physical signs of sexual assault.

Defendant, who was twenty-four years old at the time of the murder, had been known to go to the roller rink in South Amboy and had been observed interacting with Katrina while there.[1] Heather McKnight, who was defendant's girlfriend, Donna Pascale, Heather's fellow tenant in Agape House (a home for young females located in Somerville), and Robert Poquette, a tenant at the Somerville boarding home in which defendant resided, all testified that on the night Katrina was murdered defendant was looking for transportation to the South Amboy roller rink. According to Pascale, defendant told her that a friend had agreed to drive him to the rink. McKnight testified that defendant told her that he was going to the rink with a friend named "Noal." Apparently, McKnight was not planning to be with defendant that night as she intended to stay with her sister, who lived out of town, from Friday afternoon to Sunday afternoon.

The record reveals certain information from third parties concerning defendant's whereabouts during the evening of Friday, February 13, 1988. At approximately 9:45 p.m. that night, defendant encountered fourteen-year-old T.S., and two of her friends, at the Bridgewater Commons Mall. T.S. testified that she spoke with defendant at the mall for twenty minutes to a half hour before all five departed, on foot. While walking to T.S.'s home, defendant commented to T.S. that she reminded him of "Kat," a shorthand reference that T.S. took to mean "Katrina." During the walk defendant also told her he was going to a skating rink in South Amboy to scare someone. T.S. recalled that she entered her home sometime between midnight and 12:30 a.m. that night, and defendant left on foot five or ten minutes before she entered

---

[1] A friend of Katrina's, Heather Stonbely, testified to interactions that she had observed between defendant and Katrina several months before the murder when the two girls had been at the roller rink.

the house. T.S.'s mother corroborated that her daughter arrived home at approximately midnight that evening.

Both McKnight and Pascale saw defendant on Sunday, February 15. Pascale observed that defendant had cuts on one of his hands and that his knuckles were swollen, and McKnight testified that defendant's right arm appeared to be injured. On Monday February 16, Pascale went to the Somerville police to report her suspicion that defendant was involved in the publicized murder of the girl from the roller rink.

At approximately 9:30 p.m. that evening, defendant was arrested on the basis of two outstanding municipal warrants.[2] He was transported to police headquarters in Somerville for questioning about the Suhan murder. In reviewing the record concerning defendant's interrogation, we focus here on the evidence presented pre-trial at defendant's *Miranda* hearing. There are no video or audio tapes of defendant's custodial interrogations. The entire record consists of the reports of the investigating officers and their testimony at the *Miranda* hearing.[3]

The first interrogation was conducted by Detective William Moscariotola of the Old Bridge Township Police Department and by Investigator John Maslak of the Middlesex County Prosecutor's Office. The interrogation began at approximately 9:50 p.m. on February 16, after defendant was advised of his *Miranda* rights and acknowledged that he understood them. When the officers began questioning defendant concerning his whereabouts during the past weekend, the officers did not tell him that he was being questioned about the murder victim found in Old Bridge. In response to questioning, defendant told the officers that he had

---

[2] Defendant was arrested on an outstanding municipal warrant issued by the Red Bank Borough Municipal Court on January 7, 1993, and another warrant issued by the Sayreville Municipal Court on October 7, 1997.

[3] Apparently, once each officer prepared his report, he destroyed his notes from the interrogation sessions, a practice that is apparently common, but one that we disapprove of.

not been to the South Amboy roller rink since the Columbus Day weekend of the previous fall. He was then asked whether he had been to the Old Bridge bowling alley during the past weekend. He informed the officers that he had stopped there with McKnight in order for her to use a telephone. He was unclear in respect of who was driving. He told the two interrogating officers that while McKnight was using the phone he had gone into the wooded area behind the building to relieve himself. There he saw a "pile" that he said had a foul smell and contained "something red and that this red thing had a right angle." After approximately ninety minutes of questioning, defendant asked whether the interview had anything to do with the girl missing from the roller rink. The officers told him that it did, and they then confronted him with the fact that McKnight had been out of town for the weekend.

The interrogation continued and defendant became increasingly emotional, nervous, and halting in his responses. At one point, defendant began to cry and told Moscariotola that, "she freaked me out. I don't know what happened." A break was taken. When the interview resumed both officers were present in the room. Defendant, appearing to have collected himself, recanted his earlier statement, instead claiming that he had said, "it freaked me out." A short while later defendant was shown a picture of Katrina's body taken at the crime scene. According to both officers, defendant's comment, when shown the photo, was: "I didn't sexually abuse that girl." The officers terminated the interview at approximately three o'clock in the morning.

During the course of that initial interview defendant was offered a beverage and bathroom break after about two hours of questioning. Also, at approximately 2:15 a.m., after defendant had signed a consent form permitting the search of his room, a beverage was provided to him again and *Miranda* warnings were readminis- tered. Although a tape recorder was available during the inter- view, the officers did not tape any portion of the interrogation. After that initial interrogation, defendant was transported to the

Middlesex County Adult Correctional Facility in North Brunswick and held on the municipal warrants.

Defendant's second interrogation commenced at approximately 10:40 a.m. on Wednesday, February 18, at the detention facility in which he was being held. This interrogation was conducted by Maslak alone. Defendant was given fresh *Miranda* warnings and, then, during a two-hour interview, defendant recounted a version of his whereabouts that differed from that given in his first interview. As the questioning continued, he altered further the version he had just provided to Maslak. Essentially, defendant provided two conflicting but exculpatory statements placing himself far from the scene of the crime. At that point, defendant was asked and consented to have a polygraph test administered to him.

Investigator Angelini, a polygraph expert, was brought in. He conducted (what the motion court later considered to be) the third interrogation of defendant, which concluded at about 3:30 p.m. While alone with defendant, Angelini administered a pre-test polygraph and polygraph of defendant after defendant first was given fresh *Miranda* warnings and he signed consent forms for the test. Defendant's statements during this portion of the interrogation were not submitted for admission. This third interrogation is relevant only because the negative results of the polygraph were made known to defendant during the fourth and final interrogation.

The fourth interrogation started at about 3:30 p.m. Both Angelini and Maslak were present during this session in which defendant made his most incriminatory statements. They reported that defendant appeared cooperative and responsive at first. Twenty minutes into the interview, he was told that he had "failed" the polygraph test. According to Angelini, after defendant heard that, he became more pensive, withdrawn, and not as responsive as he had been during the polygraph. His responses to questions became extremely delayed. It was reported that he would take as long as five minutes before responding to a question, often putting his hand to his head as he appeared to think

about how to answer. During this fourth session, which lasted until approximately 8:00 p.m., defendant gave another version of his whereabouts the evening of Katrina's murder. He stated that he went with a man named "Russ" in a gold colored van to the Old Bridge bowling alley vicinity. Later, he told the officers that "Russ" took him to South Amboy and they both took Katrina in the van to Old Bridge, and alternatively that he did not know how he got to South Amboy but he remembered being on Stevens Avenue and seeing Katrina. In one version, it was "Russ" who allegedly attacked Katrina. During the questioning, defendant became emotional and started crying, trembling, and moaning.

Ultimately, defendant told the officers that he killed Katrina. He told them that he approached Katrina when she was walking home from the rink. He stated that after meeting up with her on Stevens Avenue near the church on that street, he walked her to the field located behind the Old Bridge bowling alley where he made sexual advances toward her. When she spurned him, he became enraged and struck her in the face with his fist. According to the officers, defendant said, "She was scared. Her eyes kept looking at me. I didn't want to see her eyes. I didn't want her eyes to see me." Defendant struck her in the face repeatedly with a two-by-four board that he took from a nearby pile of debris. He then hit her head with a rock four or five times. Believing Katrina to be dead, defendant dragged her body deeper into the field.

The officers did not record electronically the interrogation sessions that took place on February 18. Each officer conceded at trial that a statement by an interviewee normally would be taped; however, due to defendant's emotional state, the disjointed nature of his responses to questions posed, and his repeated recanting or changing of his story, they believed it preferable to make a written report of the interrogation rather than to attempt an electronically taped statement. We note here that during the overall nine-hour period in which defendant was questioned on February 18, he was provided with lunch (which he ate), dinner (which he declined,

preferring to have only a beverage), and beverage breaks and cigarettes. Moreover, although lengthy, the interrogation was conducted during regular daytime hours.

Defendant was charged under Middlesex County Indictment No. 98–11–01562 with purposeful or knowing murder, in violation of *N.J.S.A.* 2C:11–3a(1) and –3a(2). A *Miranda* hearing was conducted in which the State sought, over defendant's objection, the admission of defendant's inculpatory statements. After reviewing in summary fashion the details of each segment of defendant's interrogation, the court ruled the statements made during the first, second, and fourth interrogations to be admissible. As noted, the State was not seeking the admission of any statements made during the third (polygraph) portion of the interrogation. The motion court found that the required *Miranda* warnings had been provided, defendant had understood those warnings, and he had knowingly and intelligently waived his rights. The court also determined that defendant's statements had been made voluntarily. In the course of making its findings, the court noted defendant's high school education and that he had not been subjected to any physical or mental abuse. The court found it understandable and consistent with common sense that defendant became more emotional as his statements became more inculpatory.

Defendant also moved *in limine* for permission to introduce evidence of the subsequent January 17, 1999, murder of Nancy Noga, which had occurred while defendant was incarcerated. Noga was close in age to Katrina. Noga's body was found near to where she worked, in a location approximately one mile from where Katrina's body was found. The court refused to admit the evidence, concluding that it was too speculative notwithstanding some similarities between the murders.

Defendant was found guilty of purposeful and knowing murder following an eight-day jury trial. He was sentenced to a term of sixty years of incarceration, with a period of parole ineligibility of fifty years and fifteen days imposed pursuant to the No Early Release Act (NERA), *N.J.S.A.* 2C:43–7.2. Defendant moved for a

new trial pursuant to *Rule* 3:20–1 based on newly discovered evidence. Defendant, who is African–American, contended that a strand of hair from a Caucasian found on a wooden board near the victim could be subjected to DNA testing and therefore warranted a new trial. The motion was denied, but the State was ordered nonetheless to perform DNA testing on the hair to determine if it belonged to Katrina. Ten months afterward, the police laboratory reported that the hair was not suitable for DNA testing.

Defendant appealed and, as part of his appeal, asserted a violation of *State v. Reed,* 133 *N.J.* 237, 627 *A.*2d 630 (1993). Leave was granted to expand the record to include a memorandum prepared by the Middlesex County Prosecutor memorializing a public defender inquiry made concerning defendant. The memo in its entirety states:

## MIDDLESEX COUNTY PROSECUTOR'S OFFICE

### INTRA–OFFICE MEMORANDUM

To: FILE

From: PROSECUTOR ROBERT W. GLUCK

Date: February 20, 1998

Re: STATE V. THOMAHL S. COOK

On February 18, 1998 around mid-day I received a call from Public Defender Tom Scully. He asked me if the Public Defender's Office represents Thomahl Cook on the charges he was being held on (trespass out of Sayreville). I told him that the charges were a disorderly persons so I didn't think they would have represented him. He asked if we intended to charge Cook with the murder of Katrina Suhan. At the time we were not and I told him. He asked me to call him when and if we were going to charge him. I said okay. We charged him later that night at about 9:00 p.m.

The Appellate Division affirmed defendant's conviction in an unpublished opinion, remanding only for correction of a sentencing error.[4] In respect of the prosecutor's memorandum expanding

---

[4] The panel concluded that the version of NERA in effect at the time of the offense did not apply to murder, see *State v. Manzie,* 335 *N.J.Super.* 267, 762 *A.*2d 276 (App.Div.2000), *aff'd by an equally divided Court,* 168 *N.J.* 113, 773

the record, the court observed that no attorney-client relationship had come into existence at the time the public defender telephoned the prosecutor. Accordingly, the court concluded that there had been no violation of *Reed, supra,* in the prosecutor's handling of the public defender's inquiry. The panel further held that the failure of law enforcement to record a suspect's statement by electronic means is a factor to be weighed when determining the statement's reliability, but standing alone does not present a violation of defendant's due process rights. Finally, the Appellate Division concluded that the trial court did not err in prohibiting defendant from presenting evidence in respect of the Noga murder.

We granted defendant's petition for certification, 175 *N.J.* 548, 816 *A.*2d 1050 (2003).

## II.

### *Admissibility of Defendant's Statements*

### A. Alleged *State v. Reed* violation

■ Defendant raises multiple arguments in support of his claim that his statements to interrogators must be suppressed. We start with his contention that the requirements of *Reed, supra,* were transgressed because the prosecutor failed to inform him that a lawyer had contacted the prosecutor on defendant's behalf while defendant was being interrogated. Defendant argues that that failure infringed on his exercise of the privilege against self-incrimination.

The Fifth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." *U.S. Const.* amend. V. In *Miranda v. Arizona,* 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694

---

A.2d 659 (2001), and that the revised NERA statute should not be applied retroactively.

(1966), the United States Supreme Court established that when a person in police custody is questioned, that person must be told that he has the right to remain silent, that any statement he makes may be used against him, that he has the right to an attorney, and that if he cannot afford an attorney, one will be provided for him. *Id.* at 444, 86 *S.Ct.* at 1612, 16 *L.Ed.*2d at 706–707. A waiver of those *Miranda* rights, protecting as they do a suspect's privilege against self-incrimination, must be knowing, intelligent, and voluntary, and the State bears the burden of demonstrating that a waiver has met that test. *Ibid.*

From that well-known rule, the United States Supreme Court and this Court have established certain precepts concerning what is a knowing waiver of a defendant's *Miranda* rights. While the United States Supreme Court has held that the failure of the police to inform a defendant that his attorney was available to assist him is irrelevant to the assessment of a suspect's waiver of his *Miranda* rights, *Moran v. Burbine,* 475 *U.S.* 412, 106 *S.Ct.* 1135, 89 *L.Ed.*2d 410 (1986), defendant makes an argument based on additional protections provided under State law. Specifically, defendant contends that his protections under *Reed, supra,* have been transgressed.

In *Reed,* we noted that in New Jersey the privilege against self-incrimination derives from the common law and is codified in our statutes and rules. 133 *N.J.* at 250, 627 *A.*2d 630; *see also N.J.S.A.* 2A:84A–19; *N.J.R.E.* 503. We considered in *Reed* whether our State's separate interest in preserving a defendant's privilege against self-incrimination would be served if we were to follow the approach taken in *Moran, supra.* The defendant in *Reed* was being questioned about a murder he claimed to have witnessed. His girlfriend retained an attorney for him and that attorney attempted to consult with the defendant while he was at the prosecutor's office. The attorney was turned away, however, with the explanation that the defendant was not a suspect and that the attorney had "no right to walk into an investigation." The attorney was assured that he would be called if and when the

defendant requested an attorney. Defendant's questioning continued, but he was not informed that his attorney was physically present at the office and was attempting to confer with him. After the defendant waived his *Miranda* rights, he confessed to committing the murder. *Reed, supra,* 133 *N.J.* at 242–244, 627 *A.*2d 630.

In that context, we declined to follow the standard for a knowing waiver of the privilege against self-incrimination that was established by the Supreme Court in *Moran.* We held that when an attorney, who either has been retained on behalf of a person in custody on suspicion of a crime or has represented or is representing the suspect on another matter, is present or readily available to assist a suspect in custody being questioned, the police must communicate that information to the suspect in order for the suspect to make a knowing waiver of the privilege against self-incrimination. *Reed, supra,* 133 *N.J.* at 269, 627 *A.*2d 630. In such circumstances, depriving a suspect of the knowledge that his or her attorney is present or readily accessible renders invalid the suspect's subsequent waiver of his privilege against self-incrimination. *Ibid.*

■ A key element to the holding was that an attorney-client relationship existed between the defendant and the attorney. *Id.* at 261, 627 *A.*2d 630. Such a relationship exists when the suspect specifically requests an attorney, when the suspect, his or her family, or friends have retained an attorney on his behalf in the matter, or when the attorney has represented or is representing the suspect on another matter. *Ibid.* Notably, the rule laid down in *Reed* does not distinguish between a defendant who privately retains counsel and a defendant who obtains counsel through the public defender. If the defendant asks for representation, or already has an attorney-client relationship with a privately retained or publicly provided counsel, then the *Reed* obligation comes into force.

■ Thus, *Reed* permits a defendant to receive the benefit of his or her representation by retained counsel when waiving the

privilege against self-incrimination. *Reed* does not permit law enforcement to thwart an existing attorney-client relationship by denying to the defendant knowledge that his counsel is present or readily accessible before the defendant knowingly chooses to waive his or her privilege against self-incrimination.

We find no *Reed* violation in this case, although by that we intend no implicit approbation of the prosecutor's course of conduct. We simply agree with the Appellate Division's conclusion that an attorney-client relationship did not exist between defendant and the public defender at the time that the public defender made his inquiry to the prosecutor. The record does not indicate that the public defender told the prosecutor that he was representing defendant; indeed the public defender was asking only whether the charges for which defendant was arrested on the warrant were of such a nature as to trigger public defender representation. As they involved disorderly persons offenses, they were not, and no one argues to the contrary.[5] The public defender did not represent defendant on the unrelated disorderly persons charge for which he had been arrested, and defendant had not yet been charged with the Suhan murder. The circumstances here are not analogous to the representation that had commenced and was denied to the defendant in *Reed*. We decline to extend *Reed* by finding a violation in this case.

### B. Failure to Record Interrogation Electronically

Defendant advances the additional argument that modern notions of due process require the electronic recordation of his custodial statements as a condition for their admissibility. Because that purported condition was not satisfied in this case, defendant asserts that his statements should have been suppressed. Moreover, he asserts, with the able assistance of *amici*, that the policy reasons for requiring such additional protection to defendants and to law enforcement, and indeed, for the enhanced

---

[5] See *N.J.S.A.* 2A:158A–5 (authorizing public defender representation for indictable offenses).

efficiency of the judicial system as a whole, outweigh any inconvenience or cost occasioned by such a requirement. We consider those assertions in turn.

The federal standard for the admissibility of confessions was established in *Colorado v. Connelly*, 479 *U.S.* 157, 168, 107 *S.Ct.* 515, 523, 93 *L.Ed.*2d 473, 485 (1986), which held that a state must prove admissibility of a confession by a preponderance of the evidence. As a matter of our own jurisprudence, we require the voluntariness of a confession to be demonstrated beyond a reasonable doubt. *State v. Bey*, 112 *N.J.* 123, 134, 548 *A.*2d 887 (1988) (*Bey II* ). We have held that whether a statement is memorialized or not is but a factor contributing to the overall determination of a statement's voluntariness. See *State v. Burris*, 145 *N.J.* 509, 534, 679 *A.*2d 121 (1996). We require the State to introduce independent proof of facts and circumstances that tend to generate a belief in a statement's trustworthiness. *State v. Lucas*, 30 *N.J.* 37, 56, 152 *A.*2d 50 (1959). Furthermore, the jury is charged to treat an oral confession with caution, *State v. Kociolek*, 23 *N.J.* 400, 421, 129 *A.*2d 417 (1957), and to judge its credibility against the circumstances of its elicitation. *State v. Hampton*, 61 *N.J.* 250, 272, 294 *A.*2d 23 (1972).

Despite those safeguards, and cautionary instructions about how an incriminating statement should be evaluated, defendant contends that his statements to the police should have been suppressed solely because his interrogation was not recorded electronically. For support, defendant relies on decisions from two other state supreme courts. In *Stephan v. State*, 711 *P.*2d 1156, 1158 (Alaska 1985), the Alaska Supreme Court held that the unexcused failure to record electronically an interrogation conducted in a place of detention violates the right to due process under the Alaska constitution. The court reasoned that a recording requirement would provide an objective means for evaluating what occurred during an interrogation, protect the public's interest in honest and effective law enforcement, and protect the interests of police officers wrongfully accused of improper tactics.

*Id.* at 1161. The court also noted that compliance with the recording requirement would not be unduly burdensome as many places of detention already had working recording devices. Noting that in the cases before the court the police had recorded portions of the questioning, the court reasoned, "turning the recorder on a few minutes earlier entails minimal cost and effort." *Id.* at 1162.

The Minnesota Supreme Court imposed a recording requirement in *State v. Scales,* 518 *N.W.*2d 587 (Minn.1994), although not on the basis of a due process requirement. The Minnesota Supreme Court declined to make a determination on whether a criminal suspect has a right to have his interrogation recorded under the Minnesota Constitution. Relying instead on its supervisory power, the Court held that all custodial interrogations, including any information about rights, waiver of those rights, and all questioning, must be recorded electronically when feasible and whenever questioning occurs at a place of detention. The court observed that many factual disputes about the denial of a defendant's constitutional rights would be avoided if all conversations between the police and a suspect were recorded. *Id.* at 591.

As best we can determine, two additional states have enacted legislation that requires custodial interrogations to be electronically recorded. See 725 *Ill. Comp. Stat. Ann.* 5/103–2.1 (West 2003) (establishing presumption against admissibility for statements made during custodial interrogation unless statement is electronically recorded); *Tex.Crim. Proc.Code Ann.* art. 38.22 § 3 (Vernon 1999) (conditioning use of oral custodial statements on electronic recording of statement). In the absence of any such legislative requirement in other states that have considered the issue, no court other than the Alaska Supreme Court has found a due process requirement for electronic recordation. Thus, the overwhelming majority of courts have declined to require recording as a constitutional dictate. See *Starks v. State,* 594 *So.*2d 187, 196 (Ala.Crim.App.1991), *cert. denied,* 594 *So.*2d 187 (Ala.Crim.App. 1992); *State v. Jones,* 203 *Ariz.* 1, 49 *P.*3d 273, 279 (2002); *People*

v. Holt, 15 Cal.4th 619, 63 Cal.Rptr.2d 782, 937 P.2d 213, 241–43, cert. denied, 522 U.S. 1017, 118 S.Ct. 606, 139 L.Ed.2d 493 (1997); People v. Raibon, 843 P.2d 46, 49 (Colo.Ct.App.1992); State v. James, 237 Conn. 390, 678 A.2d 1338, 1357–60 (1996); Coleman v. State, 189 Ga.App. 366, 375 S.E.2d 663, 664 (1988); State v. Kekona, 77 Hawai'i 403, 886 P.2d 740, 745–46 (1994); State v. Rhoades, 119 Idaho 594, 809 P.2d 455, 462 (1991), cert. denied, 504 U.S. 987, 112 S.Ct. 2970, 119 L.Ed.2d 590 (1992); People v. Everette, 187 Ill.App.3d 1063, 135 Ill.Dec. 472, 543 N.E.2d 1040, 1047 (1989), rev'd on other grounds, 141 Ill.2d 147, 152 Ill.Dec. 377, 565 N.E.2d 1295 (1990); Stoker v. State, 692 N.E.2d 1386, 1390 (Ind.Ct.App.1998); State v. Morgan, 559 N.W.2d 603, 609 (Iowa 1997); State v. Speed, 265 Kan. 26, 961 P.2d 13, 24 (1998); Brashars v. Commonwealth, 25 S.W.3d 58, 60–63 (Ky.2000), cert. denied, 531 U.S. 1098, 121 S.Ct. 828, 148 L.Ed.2d 710 (2001); State v. Thibodeaux, 750 So.2d 916, 922–24 (La.1999), cert. denied, 529 U.S. 1112, 120 S.Ct. 1969, 146 L.Ed.2d 800 (2000); State v. Buzzell, 617 A.2d 1016, 1018 (Me.1992); Baynor v. State, 355 Md. 726, 736 A.2d 325, 331–32 (1999); Commonwealth v. Fryar, 414 Mass. 732, 610 N.E.2d 903, 909 n. 8 (1993); People v. Fike, 228 Mich.App. 178, 577 N.W.2d 903, 906–07 (1998); Williams v. State, 522 So.2d 201, 208 (Miss.1988); Jimenez v. State, 105 Nev. 337, 775 P.2d 694, 696–97 (1989); State v. Barnett, 147 N.H. 334, 789 A.2d 629, 631–33 (2001); People v. Martin, 294 A.D.2d 850, 741 N.Y.S.2d 763, app. denied, 98 N.Y.2d 711, 749 N.Y.S.2d 9, 778 N.E.2d 560 (2002); State v. Thibodeaux, 341 N.C. 53, 459 S.E.2d 501, 507 (1995); State v. Smith, 80 Ohio St.3d 89, 684 N.E.2d 668, 686 (1997), cert. denied, 523 U.S. 1125, 118 S.Ct. 1811, 140 L.Ed.2d 949 (1998); Commonwealth v. Craft, 447 Pa.Super. 371, 669 A.2d 394, 394–97 (1995); State v. Godsey, 60 S.W.3d 759, 771–72 (Tenn.2001); State v. James, 858 P.2d 1012, 1017–18 (Utah Ct.App.1993); State v. Gorton, 149 Vt. 602, 548 A.2d 419, 421–422 (1988); State v. Spurgeon, 63 Wash.App. 503, 820 P.2d 960, 961–64 (1991); State v. Kilmer, 190 W.Va. 617, 439 S.E.2d 881, 892–93 (1993); Gale v. State, 792 P.2d 570, 588 (Wyo.1990).

Many of those courts have noted approvingly the protections that are provided by recording an interrogation. *Jones, supra,* 49 *P.*3d at 279 (stating that recording entire interrogation process is "preferable" because it protects against admission of involuntary or invalid confessions and enables law enforcement to establish that tactics were proper); *Holt, supra,* 63 *Cal.Rptr.*2d 782, 937 *P.*2d at 241–43 (noting that requiring recording of interrogations might enhance reliability of confessions); *Raibon, supra,* 843 *P.*2d at 49 (recognizing that recording of suspect's interview may remove questions that may arise later in respect of interview's contents); *Kekona, supra,* 886 *P.*2d at 746 (stressing importance of utilizing tape recordings during custodial interrogations when feasible); *Stoker, supra,* 692 *N.E.*2d at 1390 (recommending that law enforcement adopt procedure to record interrogations); *Buzzell, supra,* 617 *A.*2d at 1018 (noting "obvious" benefits to be realized when statements are recorded); *Fryar, supra,* 610 *N.E.*2d at 909 n. 8 (finding that electronic recording of interrogations would be helpful in evaluating voluntariness of confessions because defendants, prosecutors, and courts must spend considerable time and effort to determine what transpired during custodial interrogation); *Williams, supra,* 522 *So.*2d at 208 (noting that recording helps to demonstrate voluntariness, context, and content of statement); *Jimenez, supra,* 775 *P.*2d at 696–97 (stating that requiring recordings would alleviate credibility questions for police when claiming defendant made incriminating statements); *Godsey, supra,* 60 *S.W.*3d at 771–72 (noting that electronically recording custodial interrogations would reduce court time spent on resolving interrogation disputes); *James, supra,* 858 *P.*2d at 1017–18 (describing numerous reasons for recording interrogations, including avoiding unwarranted claims of coercion and coercive tactics by police); *Kilmer, supra,* 439 *S.E.*2d at 892–93 (declining to establish blanket rule requiring recording, and holding that law enforcement "should" record interrogation of suspect where feasible and equipment is available).

So, too, have commentators canvassed the many benefits that electronic recordation would appear to provide. Paramount is the

obvious benefit derived from a recording that creates an objective, reviewable record. See Heath S. Berger, *Let's Go to the Videotape: A Proposal to Legislate Videotaping of Confessions,* 3 *Alb. L.J. Sci. & Tech.* 165, 173–74 (1993); Wayne T. Westling, *Something is Rotten in the Interrogation Room: Let's Try Video Oversight,* 34 *J. Marshall L.Rev.* 537, 549 (2001). Courts are required routinely to determine what has occurred in the interrogation room, weighing the testimony of a police officer against the testimony of an accused. Westling, *supra,* 34 *J. Marshall L.Rev.* at 549. A recording would "enhance a judge or juror's assessment of credibility by providing a more complete picture of what occurred." Berger, *supra,* 3 *Alb. L.J. Sci. & Tech.* at 173–74. Because "[e]ven the most scrupulous of witnesses is subject to forgetfulness," Westling, *supra,* 34 *J. Marshall L.Rev.* at 549, a recording of an interrogation would also provide judges and juries with a more accurate picture of what was said, as words can convey different meanings depending on the tone of voice or nuance used. *Id.* at 550.

The commentators are quick to point to the benefits that electronic recording would provide to the police also, noting that recording would protect police officers from false allegations and lend credibility to police work by demonstrating the fairness of the methods used and the legality of confessions obtained. Richard A. Leo, *The Impact of Miranda Revisited,* 86 *J.Crim. L. & Criminology* 621, 683 (1996). Recording also may improve the ability of the police to assess the guilt or innocence of suspects, it is contended, because law enforcement officials later can review an entire interrogation after investigation reveals new evidence. *Ibid.* Finally, it is asserted that electronic recording may improve the overall quality of police work by providing law enforcement officials with the ability to monitor the quality of the interrogation process and recordings can be used in training courses to demonstrate effective versus ineffective, or legally impermissible, interrogation techniques. Leo, *supra,* 86 *J.Crim. L. & Criminology* at 683–84; Westling, *supra,* 34 *J. Marshall L.Rev.* at 551.

Lastly, the commentary notes that recording ultimately may preserve judicial resources by discouraging defendants from raising "frivolous" pretrial challenges to confessions. Daniel Donovan and John Rhodes, *Comes a Time: The Case for Recording Interrogations*, 61 *Mont. L.Rev.* 223, 229 (2000); *see also* Daniel Donovan and John Rhodes, *The Case for Recording Interrogations*, 26–DEC *Champion* 12, 14 (2002). A recording of an interrogation might influence a defendant's decision on whether to go to trial. Donavan and Rhodes, *Comes a Time, supra*, 61 *Mont. L.Rev.* at 229. The potential savings that recording may have on judicial resources has been noticed by many of the courts that have considered the issue because of the significant amount of time and resources devoted to resolving disputes over confessions. *See, e.g., Fryar, supra*, 610 *N.E.*2d at 909, n. 8 (noting electronic recordation could relieve courts of "enormous" amount of time and resources spent attempting to determine what transpired during custodial interrogation). *See also Godsey, supra*, 60 *S.W.*3d at 772 (noting there is "little doubt" that electronic recordation would reduce time spent in court resolving disputes over what occurred during custodial interrogation).

On the other hand, the drawbacks to imposing an absolute requirement on recording likewise have been catalogued. One of the most common arguments against a recording requirement is the cost. Potential costs include purchase and maintenance of recording equipment, storage of tapes, transcription of tapes, and remodeling of interrogation rooms. Leo, *supra*, 86 *J.Crim. L. & Criminology* at 684–85. Some commentators point to the difficulty that rural towns may have in affording appropriate equipment. Berger, *supra*, 3 *Alb. L.J. Sci. & Tech.* at 179. Other frequently cited drawbacks are that the recording of interrogations will hamper police interrogation techniques and reduce the ability of police officers to obtain truthful confessions and admissions. *Id.* at 180. Commentators acknowledge that suspects may be reluctant to speak candidly in front of a camera. *Ibid.*; Leo, *supra*, 86 *J.Crim. L. & Criminology* at 685–86. *See also* Major Joshua E. Kastenberg, *A Three–Dimensional Model for the Use of Expert*

*Psychiatric and Psychological Evidence in False Confession Defenses Before the Trier of Fact,* 26 *Seattle U.L.Rev.* 783, 812 (2003) (stating that knowledge of electronic recording can reduce chances of effective discussion because suspects often are more willing to talk when they perceive discussion as being between only themselves and interrogating officer(s)).

Beyond the question whether to record electronically, there is the additional consideration of what portion of an interrogation ought to be recorded. While some police departments already record a suspect's confession at the end of an interrogation, advocates of recording stress that the entire interrogation session must be recorded to achieve the positive benefits of recordings. Westling, *Something is Rotten in the Interrogation Room, supra,* 34 *J. Marshall L.Rev.* at 554. To create a detailed and complete record, those commentators argue that recording must begin with the initial contact, including the *Miranda* warnings and any waiver of *Miranda* rights. *Ibid.;* Berger, *supra,* 3 *Alb. L.J. Sci. & Tech.* at 176. In that respect, we note that both the Supreme Courts of Alaska and Minnesota require recording of the entire interrogation session. See *Scales, supra,* 518 *N.W.*2d at 592 (requiring all custodial interrogations, including information about rights, waiver of those rights, and all questioning to be electronically recorded); *Stephan, supra,* 711 *P.*2d at 1162 (holding that recording of custodial interrogation in place of detention must "clearly indicate" that it recounts entire interview).[6] *See also*

---

[6] A separate consideration that has sparked debate is the manner in which videotaping is implemented. One researcher has found that altering the perspective from which a videotaped confession is recorded influences assessments of the confession's voluntariness. G. Daniel Lassiter, *Sometimes the Camera Lies: Only When the Videotape is Focused on the Suspect and the Interrogator is No Bias Discernible,* 172 *N.J.L.J.* 1027 (June 16, 2003). Lassiter has found that focusing the video camera primarily on the suspect in an interrogation has the effect of impressing upon viewers the notion that the suspect's statements more likely are freely and intentionally given, and not the result of coercion. *Ibid.* That bias was not found to be present when the camera perspective allowed for the suspect and interrogator to be viewed equally well. *Ibid.; see also* G. Daniel Lassiter, et al., *Videotaped Interrogations and Confessions: A Simple Change in*

*Barnett, supra,* 147 *N.H.* 334, 789 *A.*2d 629 (allowing admission of taped statement by defendant only if entire interrogation is recorded; otherwise proof of defendant's incriminating statement subject to admission via traditional evidential tests for reliability).

We view as significant the consequences attendant to imposing a rule precluding the admissibility of a confession based on a failure to record electronically. Indeed, even apart from requiring suppression in all such cases, if we were to encourage electronic recording of custodial interrogations, a balancing of the benefits to suspects in custodial interrogations with any drawbacks to law enforcement would be necessary. Moreover, there does not appear to be any agreement as to how electronic recordation should be implemented, or whether it should be required, encouraged formally through evidential rules, or encouraged through other informal means. We recognize that due process is a flexible concept that depends on the facts and circumstances of the matter at hand. *New Jersey Parole Bd. v. Byrne,* 93 *N.J.* 192, 209, 460 *A.*2d 103 (1983). But, there is a pragmatic aspect to a due process inquiry. We have rejected claimed due process violations in the past where the asserted deprivations implicated "an area in which fair-minded men can disagree," and "points of view could range" over a spectrum of conclusions in respect of the alleged right involved. *State v. Garvin,* 44 *N.J.* 268, 276, 208 *A.*2d 402 (1965) (internal quotation marks omitted).

█ Because there is otherwise "fair-minded" disagreement concerning the appropriateness of imposing a sweeping requirement of electronic recordation of custodial statements we hold that defendant's point of error "is not of constitutional dimension." *Ibid.* As noted, other than Alaska, no state has found a due process dictate that compels electronic recording of custodial interrogations. The other states have declined to impose by "judicial fiat" a constitutional requirement in the absence of any

---

*Camera Perspective Alters Verdicts in Simulated Trials,* 87 *J. Applied Psychol.* 867 (2002).

legislative direction. We similarly decline to do so. We reject defendant's constitutional due process argument. His statements were not wrongfully admitted merely because they were not electronically recorded. Their admissibility can be assessed adequately under our current standards for voluntariness and trustworthiness.

■ That said, we perceive benefits to all involved if custodial interrogations are recorded electronically. Our prior decisions highlight a concern for the reliability and trustworthiness of confessions as a prerequisite to their use. Confessions obtained through undue compulsion or coercion are considered involuntary and, therefore, unreliable. *State v. Jordan*, 147 *N.J.* 409, 425–28, 688 *A.*2d 97 (1997). We exclude from evidence such confessions, not only because we view an involuntary confession as intrinsically unreliable, "but also because its admission would offend the community's sense of decency and fairness." *State v. Kelly*, 61 *N.J.* 283, 292, 294 *A.*2d 41 (1972). Similarly, we have held that "a confession obtained through a custodial interrogation after an illegal arrest should be excluded unless the chain of causation between the illegal arrest and the confession is sufficiently attenuated so that the confession was 'sufficiently an act of free will to purge the primary taint.'" *State v. Worlock*, 117 *N.J.* 596, 621, 569 *A.*2d 1314 (1990) (quoting *Wong Sun v. United States*, 371 *U.S.* 471, 486, 83 *S.Ct.* 407, 416–17, 9 *L.Ed.*2d 441, 454 (1963)). The requirements of *Reed, supra*, likewise grew out of our perception of the potential coerciveness of custodial interrogations. 133 *N.J.* at 264–65, 627 *A.*2d 630.

We also have cautioned against an unmitigated faith in the truth and probity of confessions generally. As elaborated *infra*, we require confessions to be corroborated by independent evidence that "bolster[s] the confession and tend[s] to generate a belief in its trustworthiness." *Lucas, supra*, 30 *N.J.* at 56, 152 *A.*2d 50. *See also State v. Mancine*, 124 *N.J.* 232, 261, 262, 590 *A.*2d 1107 (1991) (Handler, J., concurring) (noting confessions "have long been regarded as generally suspect" and describing "experience of

courts, the police and the medical profession recount[ing] a number of false confessions voluntarily made" (citation omitted)).

The foregoing concerns militate in favor of pursuing the study of whether and how to implement the benefits of recording electronically part, or all, of custodial interrogations. We acknowledge the State's concern that electronic recording may create an artificial restriction on the interrogation dynamic. However, the fact that numerous law enforcement agencies of this State have found themselves able to overcome that drawback and are using electronic recording reduces the force of the State's concern. Those agencies apparently valued more the benefits that come from having a recording of a custodial interrogation. Indeed, in that respect, we are informed that the Attorney General, acting in conjunction with the county prosecutors, has taken steps to implement an administrative policy requiring electronic recording of final statements of suspects in homicide investigations. We are told that pilot projects concerning further use of electronic recordation are contemplated. The State also has brought to our attention that there is the potential for legislative action in this area as well. See Senate Bill No. 287 (establishing pilot program requiring use of electronic recording of custodial interrogations concerning certain violent crimes). Those steps are welcome, but this issue deserves the broad involvement of all stakeholders and, importantly, must involve the judiciary.

The judiciary bears the "responsibility to guarantee the proper administration of justice ... and, particularly, the administration of criminal justice." *State v. Williams*, 93 *N.J.* 39, 62, 459 *A.*2d 641 (1983) (citations omitted). Our courts thus have the "independent obligation ... to take all appropriate measures to ensure the fair and proper administration of a criminal trial." *Ibid.* *See also State v. Maisonet*, 166 *N.J.* 9, 22, 763 *A.*2d 1254 (2001) (noting our "responsibility to guarantee the proper administration of justice" (citation omitted)); *State v. Carter*, 64 *N.J.* 382, 392, 316 *A.*2d 449 (1974), *overruled on other grounds, State v. Krol*, 68 *N.J.* 236, 344 *A.*2d 289 (1975) ("The court's power to fashion remedies in the

realm of criminal justice is unquestioned."). Where such appropriate measures are available, they should be employed to the fullest extent feasible to enhance the fairness of proceedings.

■ The proverbial "time has arrived" for this Court to evaluate fully the protections that electronic recordation affords to both the State and to criminal defendants. That inquiry should include whether to encourage electronic recordation through the use of a presumption against admissibility of a non-recorded statement, or other means. *See, e.g., Barnett, supra,* 147 *N.H.* 334, 789 *A.*2d 629. Those considerations are important and nuanced, and should be addressed in a context broader than that permitted in any one criminal appeal. The balancing of interests will require careful and deliberate study if we are to be successful in securing to the judicial system, law enforcement, and defendants the benefits of recordation without unduly hampering the legitimate needs of law enforcement. We believe that the criminal justice system will be well served if our supervisory authority is brought to bear on this issue and we will exercise that authority mindful of the various interests involved. Accordingly, we will establish a committee to study and make recommendations on the use of electronic recordation of custodial interrogations.

### C. Other Arguments on Admissibility

The remaining question is whether defendant's statements to police were trustworthy, reliable, and voluntarily given and therefore were appropriately admitted into evidence. Defendant makes two arguments: first, he claims that his confession was obtained only after his will was overborne and, second, that his confession was not sufficiently corroborated.

■ As noted, the State must demonstrate the voluntariness of a confession beyond a reasonable doubt. *State v. Galloway,* 133 *N.J.* 631, 654, 628 *A.*2d 735 (1993). An involuntary confession can result from physical or psychological coercion. *Ibid.* However, unlike the use of physical coercion, use of psychologically oriented interrogation techniques is not inherently coer-

cive. *Ibid.* Confessions are not voluntary if derived from "very substantial" psychological pressures that overbear the suspect's will. *Id.* at 656, 628 *A.*2d 735. In determining whether a defendant's will was overborne, the totality of the circumstances must be examined, "including both the characteristics of the defendant and the nature of the interrogation." *Id.* at 654, 628 *A.*2d 735. Relevant factors include "the suspect's age, education and intelligence, advice concerning constitutional rights, length of detention, whether the questioning was repeated and prolonged in nature, and whether physical punishment and mental exhaustion were involved." *Ibid.* (citing *Schneckloth v. Bustamonte,* 412 *U.S.* 218, 226, 93 *S.Ct.* 2041, 2047–48, 36 *L.Ed.*2d 854, 862 (1973); *State v. Miller,* 76 *N.J.* 392, 402, 388 *A.*2d 218 (1978)).

■ At the suppression hearing in this case, the trial court considered many of those factors:

> It is clear from the testimony that defendant went through a serious emotional experience in giving this statement. With intermittent breaks, he was questioned by two different officers over a nine-hour period. At no time did he request to stop or ask for a lawyer. He was given drinks and cigarettes. [He] was apparently given bathroom breaks and there is no evidence that promises were made to him.

> . . .

> The defendant was a high school graduate. There was no indication that he was unwilling to speak, nor that he was excessively tired. The interrogation, although lengthy, it was all during the general work day, and there was no indication that he was sleep deprived, or that he was in any way physically or mentally abused. He was given breaks, had one meal and refused another. Although he was emotionally distraught, his will was not overborne. The emotional distress seems more related to the horrible things he was admitting than to anything else.

The trial court applied the correct standards and amply explained its application of those standards when evaluating defendant's condition while he was interrogated. We agree with the trial court's conclusion, affirmed by the Appellate Division, that defendant has not shown that he was subject to substantial psychological pressure warranting suppression of his statements. We see no reason to add to the evaluation of the trial court, and therefore reject the argument advanced by defendant.

■ Defendant also contends that his confession should have been excluded because it is uncorroborated, and that his motion for judgment of acquittal should have been granted. When the State seeks to introduce a confession into evidence, "some corroboration is required as a matter of law but if there is such corroboration, [it is for] the jury [to] resolve 'arguments and speculation' about its weight and sufficiency." *State v. Di Frisco*, 118 *N.J.* 253, 271–72, 571 *A.*2d 914 (1990), *cert. denied, DiFrisco v. New Jersey*, 537 *U.S.* 1220, 123 *S.Ct.* 1323, 154 *L.Ed.*2d 1076. Commentators have noted that "New Jersey's requirements are narrow with respect to the quantum of evidence required to establish corroboration" of a confession offered by the State for the truth of its contents. 7 J. Wigmore, *Wigmore on Evidence*, § 2071, at 515 n. 3 (Chadbourn rev.1978) (citing *Lucas, supra*, 30 *N.J.* 37, 152 *A.*2d 50; *State v. Johnson*, 31 *N.J.* 489, 158 *A.*2d 11 (1960)), *quoted in DiFrisco, supra*, 118 *N.J.* at 273, 571 *A.*2d 914. Under that standard

> the State ... must produce only "independent proof of facts and circumstances which strengthen or bolster the confession and tend to generate a belief in its trustworthiness." *Lucas, supra*, 30 *N.J.* at 56[, 152 *A.*2d 50].... Or, in other words, "[a]ll elements of the offense must be established by independent evidence or corroborated admissions, but one available mode of corroboration is for independent evidence to bolster the confession itself and thereby prove the offense 'through' the statements of the accused."
>
> [*State v. Mancine, supra*, 124 *N.J.* at 251, 590 *A.*2d 1107 (quoting *DiFrisco, supra*, 118 *N.J.* at 273, 571 *A.*2d 914 (quoting *Smith v. United States*, 348 *U.S.* 147, 156, 75 *S.Ct.* 194, 199, 99 *L.Ed.* 192, 200–01 (1954))).]

■ Our corroboration standard requires that the trial court "determine whether there is any legal evidence, apart from the confession of facts and circumstances, from which the jury might draw an inference that the confession is trustworthy." *Lucas, supra*, 30 *N.J.* at 62, 152 *A.*2d 50. The corroboration requirement has both legal and factual components. As a matter of law, the trial court initially must determine whether the State has presented independent corroborative evidence of the trustworthiness of the confession. If the State presents "some" corroboration, *DiFrisco, supra*, 118 *N.J.* at 271, 571 *A.*2d 914, the confession is submitted to the fact finder to "resolve arguments and speculation

about its weight and sufficiency." *Id.* at 272, 571 *A.2d* 914 (internal quotation marks omitted).

As noted by the Appellate Division, the State met its burden, producing more than sufficient evidence to corroborate the substance of defendant's confession for purposes of sending the question of its reliability to the jury for determination. The State's witnesses testified about where Suhan's body was discovered and the injuries she suffered, which information corresponded to defendant's statements about his presence at the body's location and what he observed, specifically his reference to the "red thing" nearby the pile he saw there, and his description of the manner in which he attacked Suhan. Furthermore, multiple witnesses testified about defendant's expressed desire to go to the roller rink on the night of the crime, and one observed injuries to defendant's right hand the day after the murder occurred. We conclude that the State presented the corroboration required under *Lucas* and *DiFrisco,* and that the trial court properly let the jury resolve how much weight the confession should be given.

Moreover, it was for the jury to evaluate the strength of that evidence, weighed against the State's failure to demonstrate definitively how defendant got to South Amboy. And, although sketchy, there was evidence that defendant could drive (notwithstanding his lack of a driver's license), and that there was adequate time for him to have gotten from Somerville to South Amboy. Thus, although defendant never argued at trial that the jury's conviction was against the weight of the evidence, not having moved for a new trial on this ground in a timely manner, see *Rule* 2:10–1, defendant has not proven that the guilty verdict was a manifest denial of justice. We reject defendant's separate argument that the verdict was against the weight of the evidence.

### III.

Defendant also argues that he was denied a fair trial because he was prevented from making a presentation to the jury concerning evidence of a similar murder, committed while defen-

dant was incarcerated, that would have presented the prospect of third-party guilt. A defendant is entitled to introduce evidence that another person committed the crime or crimes of which the defendant is charged. *State v. Jimenez*, 175 *N.J.* 475, 486, 815 *A.*2d 976 (2003). Often a defendant attempts to place responsibility for the crime on a specific third party. See *State v. Koedatich*, 112 *N.J.* 225, 297–312, 548 *A.*2d 939 (1988), *cert. denied*, 488 *U.S.* 1017, 109 *S.Ct.* 813, 102 *L.Ed.*2d 803 (1989). A corollary is the situation presented here in which a defendant seeks to introduce similar "other-crimes evidence defensively." *State v. Garfole*, 76 *N.J.* 445, 453, 388 *A.*2d 587 (1978) (*Garfole* I). The standard for introducing defensive other-crimes evidence is lower than the standard imposed on "the State when such evidence is used incriminatorily [because] when the defendant is offering that proof exculpatorily, prejudice to the defendant is no longer a factor, and simple relevance to guilt or innocence should suffice as the standard of admissibility." *Id.* at 452–53, 388 *A.*2d 587.

Even if defensive other-crimes evidence passes the "simple" relevancy test, however, a court must still consider whether " 'its probative value is substantially outweighed by the risk that its admission will either (a) necessitate undue consumption of time or (b) create substantial danger of ... confusing the issues or of misleading the jury.' " *Id.* at 455–56, 388 *A.*2d 587 (quoting former *Evid. R.* 4).[7] Thus, a trial court must analyze the prof-

---

[7] Former *Evidence Rule* 4 was superseded by *N.J.R.E.* 403, which states:

Except as otherwise provided by these rules or other law, relevant evidence may be excluded if its probative value is substantially outweighed by the risk of (a) undue prejudice, confusion of issues, or misleading the jury or (b) undue delay, waste of time, or needless presentation of cumulative evidence. The intention of *N.J.R.E.* 403's drafters was "to retain the principles of *N.J. Evid. R.* 4 as construed by New Jersey Courts." *1991 Supreme Court Committee Comment to N.J.R.E. 403.* We note that *N.J.R.E.* 404, dealing with the admission of other-crimes evidence by the State against a defendant, has no bearing on the current inquiry, and nothing in this opinion should be read to suggest that the heightened protections afforded defendants by *N.J.R.E.* 404 may be used to prohibit a defendant from introducing exculpatory other-crimes evidence.

fered defensive other-crimes evidence pursuant to *N.J.R.E.* 403. In *Garfole* I, we characterized the trial court's determination on the admissibility of defensive other-crimes evidence as "highly discretionary," depending as it does on the weighing and balancing of the various *Rule* 403 factors. *Id.* at 457, 388 *A.*2d 587. *Accord State v. Bull,* 268 *N.J.Super.* 504, 511–13, 634 *A.*2d 101 (App.Div. 1993) (holding that, under "highly discretionary" standard, trial court's refusal to admit portion of defensive "other crimes" evidence at most was harmless error).

*Garfole* I is instructive. In that case the defendant was charged in relation to five incidents involving the molestation of minors. The State dismissed the charges against the defendant concerning all but one of the episodes, and the defendant was convicted on all charges arising from that remaining episode. The defendant attempted to offer evidence of the four episodes for which all charges against him were dismissed, hoping to establish that the similarity of the conduct in each of the five episodes led to the conclusion "that one person was responsible for all of them and that defendant was not that person because he had an alibi for all but two of the occasions involved." *Id.* at 448, 388 *A.*2d 587. The trial court rejected the defendant's proffer, and we remanded for a determination concerning whether the proffered evidence satisfied our modified relevancy analysis. *Id.* at 457, 388 *A.*2d 587. On remand, the trial court found that the probative value of the defendant's proffer was substantially outweighed by the likelihood that the jury would be confused and misled because defendant's evidence "would result in a series of 'mini-trials' as to defendant's guilt on charges for which he was not being tried." *State v. Garfole,* 80 *N.J.* 350, 352, 403 *A.*2d 888 (1979) (*Garfole* II). We agreed with the trial court's conclusions and affirmed. *Ibid.*

In this matter, during a pre-trial *Rule* 104 hearing, defendant sought to present evidence of the murder of Nancy Noga, a young, Caucasian female, about the same age as Katrina Suhan who, like Katrina, had brown eyes and long brown hair. Noga's body was found in January 1999, in an area approximately one mile from

where Suhan's body was found. Both victims encountered their assailants while walking home at night. Noga's death also was caused by a blunt trauma to her head. Because the Noga investigation was ongoing, the Court's review included *in camera* review of certain information.

Similar to *Garfole* I, defendant sought to establish that an unknown third person committed both murders, which if true, would raise a reasonable doubt concerning defendant's guilt because he was incarcerated at the time of Noga's murder. The trial court found that the Noga murder met the "simple relevance" requirements of *Garfole* I for introducing defensive other-crimes evidence because of the "superficial" similarity of the victims, who were close in age and body-type. However, the trial court also determined that the probative value of the proffered evidence was minimal. Specifically, although Katrina's assailant had a sexual motive, there was no evidence of any sexual motive in the Noga killing. Also, Suhan appears to have been abducted by her assailant in a vehicle and taken to the area where her body was found. In contrast, there was no evidence that Noga was abducted—Noga's body was found near where she was last seen. The trial court found "nothing distinctive to tie the two [crimes] together in any manner to indicate that they were the work of the same person." Finally, the trial court observed that it would have to hold a "mini-trial" of sorts on serial killers and homicidal pathology to link the two crimes, an exercise that the court determined would have "tremendous potential for confusing and misleading the jury." On balance, the court determined that those countervailing factors substantially outweighed the minimal probative value of the proffer and excluded the evidence.

We accord substantial deference to the trial court's "highly discretionary determination." *Garfole* I, *supra*, 76 *N.J.* at 457, 388 *A.*2d 587; *see generally State v. Morton*, 155 *N.J.* 383, 454, 715 *A.*2d 228 (1998) (citing *Koedatich*, *supra*, 112 *N.J.* at 313, 548 *A.*2d 939 (affirming trial court's *N.J.R.E.* 403 ruling that "was not a clear error of judgment and did not result in manifest denial of

justice")). The Appellate Division aptly described the trial court's analysis as "comprehensive and thoughtful." *Cook, supra,* slip op. at 16. As in *Garfole,* on review of a full record and the application of the correct test for admissibility, we find no clear error of judgment or manifest denial of justice. We affirm the trial court's denial of defendant's asserted evidence of third-party guilt.

## IV.

The judgment of the Appellate Division is affirmed.

Justice LONG, dissenting.

Although recognizing our supervisory power over courts, as well as our overarching interest in the integrity of the criminal interrogation process, the majority opinion falls short of what I view as necessary definitive action. I would take the lead of the Minnesota Supreme Court and declare today, pursuant to our supervisory authority, that all criminal interrogations must be recorded electronically, where feasible, when the interrogation occurs at police headquarters or at another place of detention. *State v. Scales,* 518 *N.W.*2d 587 (Minn.1994).

In the final analysis, a determination of the admissibility of a defendant's statement in a criminal proceeding is a purely judicial function. Why we should suffer, for one more day, the funneling of the reality of an interrogation through the lenses of partisans, with the concomitant frailty of language and recollection, when a true recording could be made, is simply beyond me.

The recording requirement would provide courts with the best evidence against which to evaluate a defendant's challenge to the admission of an inculpatory statement. At the same time, it would enhance public confidence in law enforcement and insulate police officers from wrongful assaults on their integrity. That electronic recording would place courts in the very best position to properly assess the admissibility of a confession simply cannot be doubted. Moreover, as the majority has acknowledged, the "sky is falling" arguments advanced by the State are belied by the reality that

police agencies throughout the nation have undertaken electronic recording with no dire consequences.

I have no difficulty with the majority's notion of establishing a committee to study the issue further. However, it is my opinion that that committee should be charged with recommending the details and specifics of electronic recording and filling in the interstices of a procedure that we, in the first instance, should have mandated.

*For affirmance*—Chief Justice PORITZ and Justices VERNIERO, LaVECCHIA, ZAZZALI and WALLACE—5.

*For reversal*—Justice LONG—1.