**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is only binding on the
parties in the case and its use in other cases is limited. R.1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4599-13T2

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

RAYMOND WILSON,

    Defendant-Appellant.

_____

Submitted September 14, 2016 — Decided  July 27, 2017

Before Judges Fuentes and Carroll.

On appeal from the Superior Court of New Jersey, Law Division, Monmouth County, Indictment No. 12-02-0210.

Joseph E. Krakora, Public Defender, attorney for appellant (James K. Smith, Assistant Deputy Public Defender, of counsel and on the brief).

Christopher J. Gramiccioni, Monmouth County Prosecutor, attorney for respondent (Monica do Outeiro, Assistant Prosecutor, of counsel and on the brief).

Appellant filed a pro se supplemental brief.

PER CURIAM

Defendant Raymond Wilson was tried before a jury and found guilty of first degree armed robbery, N.J.S.A. 2C:15-1; third degree aggravated assault with a deadly weapon, N.J.S.A. 2C:12-1b(2); third degree terroristic threats, N.J.S.A. 2C:12-3b; third degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4d; and fourth degree unlawful possession of a weapon, N.J.S.A. 2C:39-5d. This was the second time defendant stood trial on these charges. The court declared a mistrial the first time because the jury could not reach a unanimous verdict.

After applying the doctrine of merger, the trial judge sentenced defendant to an aggregate term of fifteen years, with an eighty-five percent period of parole ineligibility and five years of parole supervision, as required under the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. The judge also imposed the mandatory fines and penalties.

Defendant now argues, for the first time on appeal, that the trial court erred when it failed to sua sponte instruct the jury on the concept of accomplice liability and allow the jury to convict defendant of second degree robbery. Although defendant is represented by counsel in this appeal, he submitted a pro se supplemental brief in which he argues the trial court erred by not suppressing the out-of-court eyewitness identification under the

standards adopted by our Supreme Court in State v. Henderson, 208 N.J. 208 (2011). We reject defendant's arguments and affirm.

We gather the following facts from the record developed before the trial court.

In the summer of 2011, Margaret Gillis owned two McDonald's fast food restaurants in Neptune Township. Gillis hired Stephanie Thompson, a retired teacher, to pick up the sales proceeds generated by the restaurants from Monday through Saturday and to deposit the money at a local branch of Wells Fargo Bank. The restaurants were open seven days a week, but the bank closed on Sundays, so Thompson's Monday pick-ups contained the sales proceeds from Saturday and Sunday. When this incident occurred, Thompson had worked for Gillis for the past eleven years.

At approximately 7:45 a.m. on Monday, August 1, 2011, Thompson drove to the two restaurants and picked up the weekend sales proceeds. She placed the bag containing the deposits on the front passenger's side floor of the car and headed to the Wells Fargo Bank branch located at the intersection of Route 33 and Fortunato Place in Neptune. She parked the car in a no parking zone located "right in front of the night deposit box." Although the bank opened at 9:00 a.m., Thompson testified she customarily delivered the bag with the cash to the tellers one hour before because the deposits often comprised thousands of dollars.

Following her ordinary routine, Thompson reached down and grabbed the deposit bag located at the passenger side floor of her car. As she did this, an unknown man "snatche[d] open" the driver's side door and said: "[T]his is a robbery." Thompson initially thought this was mere "horseplay." As she explained:

> Being that you see the same people almost every day and, you know, like I'm from the town, you know a lot of people, I'm thinking this is horseplay because everybody knows, you know, you see the same people. I'm thinking somebody is going to say "don't do two things at one time," or "keep the door locked." You know, last thing in my head is robbery.

Thompson's instinctive reaction to see innocuous "horseplay" in the face of danger was supported by the physical characteristics of her assailant. As Thompson explained:

> I'm thinking this real quick because I['ve] been at the high school 37 years, so you know a lot of people know you. There's a lot of horse play, but, you know, I'm saying to myself, this old geezer. I'm thinking this is one of the men that you see every day. Some men sit in McDonald's, read the paper. Some, you know, seniors come in for the senior coffee. I knew right away. I just knew that, hey, why would somebody want to rob me. That wouldn't make sense to me.

Thompson finally realized that she faced a dangerous situation when the assailant repeatedly yelled: "I'm going to kill you." The man then used a small knife to cut Thompson's face and "blood was everywhere." Despite her injuries, Thompson remained defiant, "banging," "hitting," and "cussing" her attacker. In her

4

own words: "I put up a fight." Thompson also maintained direct eye contact with defendant during the five or six minutes he was in her car. As the altercation wound down, Thompson noticed the assailant looked familiar. A few days later, she realized she knew him because he frequented the McDonald's. Defendant eventually grabbed the bag with the deposits, left the car, and fled to an adjoining parking lot. Gills, the restaurant owner, testified the bag contained $17,170.33.

While the robbery was happening, Trevor White had driven to the bank's parking lot to withdraw money from an ATM. He noticed Thompson's car door was open, a woman was sitting in the vehicle's driver seat, and a man was "leaning on the seat on his right knee, [with his] left foot out the door." Because he did not hear any cries for assistance or anything else that seemed suspicious or untoward, he did not "pay that much mind" to it. However, as he returned to his car, White heard someone say "help" twice. When White looked at Thompson's car, he saw the man was partially inside the car and had a "knife or a fork" in his hand. White sounded his car horn to alert the man of his presence and called 9-1-1.

White next stepped out of his car and yelled at the man: "[W]hat you doing, get out of here." White lost sight of the assailant when he ran behind bushes at a nearby parking lot. Although White did not see the assailant's face, he saw him get

away in a green Pontiac Bonneville that "was going down Fortunato." White described the Pontiac to the 9-1-1 operator as a 1993 or 1994 model with a spoiler.

At approximately 7:52 a.m., Neptune Police Officer Michael Allen responded to a report of a "robbery in progress." Allen knew Thompson based on her work making these deposit runs for McDonald's. He observed Thomson had suffered a laceration to her face and was bleeding. Both Thompson and White provided Allen with a description of the assailant. Thompson in particular described her attacker as a heavyset "[b]lack male, approximately 45 to 55 years old," "wearing a light blue polo . . . style shirt," "pants [of unknown color]," and "a baseball cap." White gave a similar description, but added the man wore "gray khaki pants."

Neptune Police Officer Erick Amadruto heard the radio call of the robbery, which included a description of the assailant, the vehicle used to flee the scene, and its direction of travel. Amadruto found a Pontiac Bonneville with New York license plates on Winding Ridge Drive, parked in a parking lot of a condominium located approximately a quarter mile from the scene of the robbery. Amadruto saw a bloody white towel on the car's center console gear shaft and blood on an armrest. The vehicle was towed to the Neptune Police Department. The car was registered to Jerome Coverdale of Yonkers, New York. Coverdale told law enforcement

investigators that his friend Raymond Wilson used the car exclusively. Inside the car, law enforcement investigators found a towel stained with blood, a baseball cap, a sneaker stained with blood, a grill fork, and documents. The New Jersey State Police Laboratory forensically investigated and analyzed the DNA retrieved from the items the police recovered inside the car and found they matched defendant's DNA. Investigators also found defendant's wallet and social security card in the car.

On August 2, 2011, Monmouth County Prosecutor's office Detective Jose Cruz, acting as an independent agent, administered an eyewitness identification procedure in which Thompson selected defendant's photograph from an array of six photographs. Thompson also provided investigators with a detailed statement describing the assailant. White similarly selected defendant's photograph as the man he saw in Thompson's car.

Law enforcement investigators learned that a man named Shequan Williams, whose wife worked at McDonald's, originally conceived of the plan to rob Thompson. Williams, however, did not participate in the robbery. When he later learned that Thompson had been injured in the scuffle over the deposit money, he voluntarily contacted a detective he knew from the Asbury Police Department and gave a full statement on September 9, 2011.

Williams also testified at trial as a witness for the State. He provided the following explanation for his decision.

> [W]hen I find out that this lady got cut in her face, man, that's what got me upset. Like I would have left it alone. I would have left it alone, that was my wife's teacher. That was my wife's teacher. She's a real close family friend and it was just wrong, like, come on, she's an old lady. You got to cut an old lady? A [sic] old lady?
>
> PROSECUTOR: Let me stop you for a second. Mr. Williams, you're talking about how it's wrong, correct?
>
> A. Yes.
>
> PROSECUTOR: But you said that you planned to rob her yourself, correct?
>
> A. Yes.
>
> PROSECUTOR: Why is what you were going to do any different than what happened?
>
> A. I wouldn't hurt her, at all.
>
> PROSECUTOR: How would you have done it?
>
> A. I would have snatched the bag and ran. That's what I would have done.

Williams stated he originally approached his friend Marcus Evans with the idea of robbing Thompson. Williams and Evans met defendant in August 2011. The three men went to McDonald's to see how Thompson picked up the deposit bag. They next followed Thompson to the bank. On August 1, 2011, Evans told Williams that he was "going to take this job" from him because he was taking

8                                                      A-4599-13T2

"too long about it." Williams interpreted Evan's message as a threat to take away money that Williams depended on to finance a vacation with his wife. He responded by immediately going to his house to retrieve supplies he needed to rob Thompson without being identified. These items included "a gray hoodie and stocking cap."

When Williams drove into the Wells Fargo Bank parking lot, he received another call from Evans warning him not to go forward with the robbery. As Williams approached the Bank's parking lot, he noticed defendant looking inside the trunk of a green car. This prompted Williams to abandon his plan to rob Thompson. As Williams explained to the jury: "I'm going to leave because I'm not going to jail for some stupid shit that they do." Williams identified defendant as the assailant, both in court and through a photo array presented during the investigation.

After Williams gave his statement related to this crime on September 9, 2011, he was arrested on an open parole violation warrant issued by New York State and housed in the Monmouth County Correctional Institution (MCCI). While awaiting disposition of this parole violation, Williams encountered defendant while they were both in the MCCI Intake Housing area. Williams also interacted with defendant when defendant was housed in the "G2" section of the MCCI, which Williams claimed was "right next door

to me." Williams provided the following description of this custodial setting:

> So there's a big glass that separates us. We see each other every day. I actually didn't know that he was there at first until . . . I saw my brother-in-law and when I saw my brother-in-law, I happened to see Mr. Wilson sitting by the table watching T.V. also; and I asked my brother-in-law to call him. I wanted to make sure that that was the person that I saw or that person that I met.
>
> When I saw him, I asked him to come outside. It's all glass, all around, and it was their time for yard. We had the gym, but we can talk through the glass or we can talk through the doors and we had a conversation.
>
> In that conversation, he admitted to me that he did it. He told me that he didn't cut her, that all he did was put the fork to her face. I said a fork? He said yeah, a fork. You know, one of those big BBQ fork[s]? That's all I had. He put the fork to her face and the only reason she got cut is because how she was fighting. He said, man, that bitch was strong. She was trying to bite my fingers and everything, just going off.

Defendant presented an alibi defense. He denied having any involvement with this crime because he was home in Yonkers, New York on the morning of August 1, 2011. In support of this defense, defendant called his wife Lisa Stewart as his alibi witness. As of the time of trial, Stewart testified she had been married to defendant for twenty-nine years. She and defendant had never been to Neptune before defendant was arrested on August 10, 2011 in

10

connection with this crime.[1]  According to Stewart, at 7:00 a.m. on Monday, August 1, 2011, the day and time the robbery occurred, defendant was at home with her in Yonkers.

Stewart testified she worked for the WestMed Medical Group as a "clerical associate's office manager" when the robbery occurred.  When she woke up at 7:00 a.m. that Monday to go to work, defendant was "[i]n the bed with a hangover."  When asked why he was "hungover," Stewart responded: "Because he went out th[e] night before."  When defense counsel asked her to elaborate on defendant's condition that morning, Stewart stated: "Hung over[,] [d]runk, drunk, drunk, drunk, like when he came in, and then that morning he was just laying in the bed sick, you know. If you drink too much[,] you get a hangover and he was just sick."

Defendant was sixty-five years old when he testified in his own defense on December 10, 2013.  He corroborated his wife's testimony about being hungover when the robbery occurred.  He testified he was "socializing" at the "marina" the night before and overextended himself.  He did not remember which one of his "associates" drove him home.  Although he realized his car was missing, defendant claimed he did not learn that Williams and Evans had taken it until later.

---

[1] Stewart testified that defendant was initially held in a jail located in Westchester, New York for a period of two to three weeks before he was transported to the MCCI.

Defendant testified he knew Evans "[f]rom the neighborhood." He did not know Williams at all until he met him at a party in Yonkers. He claimed Williams set him up as the "fall guy" in this robbery. He saw both Williams and Evans at the MCCI and claimed they threatened him "[i]n a roundabout way." When asked by his attorney to elaborate, defendant merely stated: "Just keep your mouth shut." Although defendant denied any involvement in the robbery, he conceded the towel that the police found inside his car contained his blood. He claimed the blood was on the towel from a self-inflicted injury to his finger that occurred about one month before the robbery.

Against this record, defendant now appeals raising the following arguments.

> POINT I
>
> GIVEN THE PROSECUTION'S THEORY THAT MARCUS EVANS AND SHEQUAN WILLIAMS WERE "INVOLVED IN" THE ROBBERY WITH DEFENDANT, THE TRIAL COURT ERRED IN FAILING TO CHARGE THE JURY ON ACCOMPLICE LIABILITY, AND IN FAILING TO GIVE THE JURY THE OPTION OF CONVICTING DEFENDANT OF SECOND-DEGREE ROBBERY. (Not Raised Below)
>
> POINT II
>
> THE TRIAL COURT ERRED IN FAILING TO INSTRUCT THE JURY THAT IT SHOULD RECEIVE AND WEIGH SHEQUAN WILLIAM'S TESTIMONY ABOUT DEFENDANT'S SUPPOSED CONFESSION WITH CAUTION, AND ONLY CONSIDER IT IF THEY BELIEVE IT TO BE TRUE. (Not Raised Below)

A-4599-13T2

In his pro se supplemental brief, appellant raises the following argument.

POINT I

THE TRIAL COURT SHOULD HAVE SUPPRESSED THE RESULTS OF THE EYEWITNESS IDENTIFICATION AS IMPERMISSIBLY SUGGESTIVE AND UNRELIABLE.

We begin our analysis by emphasizing that all of the arguments defendant now makes in this appeal were not raised before the trial court. Thus, these arguments will be reviewed under the plain error standard, which requires this court to disregard any error or omission "unless it is of such a nature as to have been clearly capable of producing an unjust result[.]" R. 2:10-2. We must also review the jury charge as a whole. State v. Baum, 224 N.J. 147, 159-60 (2016). Guided by this standard of review, we are satisfied the trial court properly instructed the jury on all of the relevant legal issues.

Williams's testimony describing his role in this crime did not warrant that the court sua sponte instruct the jury on the legal elements of accomplice liability as defined in N.J.S.A. 2C:2-6. Defendant's defense strategy was based on the alibi testimony presented by his wife. Thus, defense counsel did not ask the court to instruct the jury on accomplice liability during the charge conference held pursuant to Rule 1:8-7(b).

13

Defendant's remaining arguments raised by his appellate counsel lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2). In the interest of clarity, we indicate there was no rational basis for the trial judge to sua sponte instruct the jury on the lesser included offense of second degree robbery. See State v. Carrero, ____ N.J. ____, ____ (2017) (slip op. at 19); N.J.S.A. 2C:1-8(e). The trial court also correctly instructed the jury on how to consider and evaluate Williams's testimony concerning defendant's alleged inculpatory statements. State v. Cook, 179 N.J. 533, 552 (2004).

Finally, defendant's pro se argument is wholly without merit. Applying the then-prevailing analytical standards, the trial court found the law enforcement investigators properly followed the identification procedures acceptable at the time. The standards that the Supreme Court established in State v. Henderson, 208 N.J. 208, 302 (2011), do not apply to this case.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

14                                                                    A-4599-13T2